UNITED STATES of America, Appellee,

v.

Antonio G. POLYTARIDES, Appellant.

No. 77–1962.

United States Court of Appeals,
Fourth Circuit.

Argued July 17, 1978.

Decided Oct. 13, 1978.

David Carey Woll, Rockville, Md., for appellant.

Daniel M. Clements, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before BOREMAN and FIELD, Senior Circuit Judges, and HALL, Circuit Judge.

BOREMAN, Senior Circuit Judge:

Antonio Polytarides was convicted by a jury of the illegal transfer of firearms (26 U.S.C. § 5861(e)) and the illegal exportation of defense articles (22 U.S.C. § 2778(b)(2) and (c)). He contends on appeal that the trial court erred in: (1) refusing to give his requested instruction on coercion-compulsion; (2) refusing to give his requested instruction on criminal action taken pursuant to the advice of counsel; and (3) denying his motion for a mistrial based upon the prosecutor's alleged improper closing argument.

According to the evidence Polytarides arranged with one Mr. Tagyar of the Iraqi Mission to the United Nations in New York City to act as agent in purchasing two hundred MAC-10 submachine guns equipped with silencers. Tagyar gave Polytarides a certified check for $79,000 for the purchase of the weapons. The United States government has not maintained diplomatic relations with Iraq since 1967 and has imposed an arms embargo on that country. Nevertheless, Polytarides purchased two hundred of the specified machine guns from licensed firearms dealers in Texas for $21,000 but the dealers reported that they were unable to procure the silencers in the large quantity as specified in the order. When Polytarides told the Texas dealers that he intended to transfer the firearms to the Iraqi government they warned him repeatedly that this transfer would be illegal without prior approval from both the Department of the Treasury and the Department of State. As a cautionary measure, the Texas firearms dealers telephoned an agent of the Bureau of Alcohol, Tobacco and Firearms, the Department of the Treasury, to inform that government agency of the possible impending violation of the law.

Polytarides first arranged to have the weapons shipped from storage in Georgia to Fargo International, a licensed firearms dealer with a warehouse in Kensington, Maryland. One hundred of the guns were ultimately shipped to Fargo International in Maryland, but Polytarides directed the shipping company to divert the other one hundred guns from their designated delivery point (Kensington, Maryland) to the Iraqi Mission in New York City. The guns were delivered to the Iraqi Mission, and the United States was able to recover from the Iraqi government only seventy of those so delivered. Thereafter the United States seized the other one hundred guns remaining in the Fargo International warehouse. No application had ever been made to, or approved by, either the Department of the Treasury or the Department of State for the transfer of these guns to Iraq.

Polytarides testified that his actions were coerced by threats of Tagyar that he would have Polytarides and his family "wiped away" if the guns were not delivered to the Iraqi Mission as agreed. Polytarides further testified that he was under pressure from his employer, Mr. Gross of McGrath Industries, to obtain the weapons for the Iraqi government.[1] Polytarides argues that

---

1. Polytarides argues that he particularly felt this pressure from Gross because Gross was his sponsor for employment in regard to Polytarides' preference classification as an alien.

the judge erred both in refusing to give an instruction on coercion-compulsion and by instructing the jury that the pressure asserted by the defendant to have been placed on him was not a defense to the crimes with which he was charged.

The instruction on coercion-compulsion requested by Polytarides states in pertinent part:

> Coercion or compulsion may provide a legal excuse for the crime charged in the indictment. In order, however, to provide a legal excuse for any criminal conduct, the compulsion must be present, and immediate, and of such a nature as to induce a well-founded fear of impending death or serious bodily injury; and there must be no reasonable opportunity to escape the compulsion without committing the crime, or participating in the commission of the crime. Acts done under such coercion or compulsion are not done willfully.

1 Devitt & Blackmar, Federal Jury Practice and Instructions, § 14.16, at 414 (3d ed. 1977). *See United States v. McClain,* 531 F.2d 431 (9 Cir. 1976); *United States v. Nickels,* 502 F.2d 1173 (7 Cir. 1974); *United States v. Birch,* 470 F.2d 808 (4 Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973); *Castle v. United States,* 120 U.S.App. 398, 347 F.2d 492 (D.C. Cir. 1964), *cert. denied,* 381 U.S. 929, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965).

■ Tagyar couched his threats in vague terms of *future* reprisals. In light of the fact that apparently no action was ever taken by Tagyar to carry out these threats, we believe Polytarides failed to demonstrate that the compulsion was present and immediate. *See United States v. Patrick,* 542 F.2d 381, 388 (7 Cir. 1976). Tagyar was several thousand miles away in Bagdad at the time Polytarides directed the shipping company to divert delivery from Kensington, Maryland, to the Iraqi Mission in New York City and the guns were delivered days before Polytarides expected Tagyar to re-turn from Bagdad. *See United States v. Gordon,* 526 F.2d 406, 408 (9 Cir. 1975). Because Tagyar's threats were not of an immediate nature and Gross' threats would not result in serious bodily harm, we reach the conclusion that the judge did not err in refusing to give the jury the standard instruction on coercion-compulsion and in instructing the jury as he did.

Polytarides also argues that the trial court erred in refusing to give the jury the standard instruction on the defense of criminal action taken on advice of competent counsel. Again, there appears to be no factual basis for such an instruction. Polytarides received financial advice from a Mr. Friedland, a man who allegedly held himself out to Polytarides as being an attorney. In fact, Friedland was a disbarred attorney who was not engaged in the practice of law. Polytarides testified that he did not know Friedland was not a practicing lawyer until Friedland admitted this fact at trial. Friedland had allegedly told Polytarides that there was nothing wrong with the arms transfer and, in light of Tagyar's threats against Polytarides, Polytarides should go ahead with the transaction and deliver the guns to the Iraqi Mission as planned.

■ Even assuming *arguendo* that Polytarides in good faith thought Friedland was a competent attorney, that he disclosed all material facts to Friedland and that he acted strictly in accordance with Friedland's advice, this still would not have stated a valid defense. A crucial element in the defense of acting upon the advice of counsel is that defendant secured the advice on the lawfulness of his *possible future conduct.* See 1 Devitt & Blackmar, Federal Jury Practice and Instructions, § 14.12 at 396 (3d ed. 1977). It is clear from the evidence that Polytarides had already purchased the guns per his agreement with Tagyar and had stated his intention to the Texas firearms dealers to send the guns to the Iraqi Mission prior to informing Friedland of the

---

The reason for this sponsorship was to allow Polytarides, a Greek national without a permanent visa, to remain in the United States for the purpose of continuing in particular employment.

existence of the agreement. The basis for the defense of action taken on the advice of counsel is that, in relying on counsel's advice, defendant lacked the requisite intent to violate the law. *United States v. Painter,* 314 F.2d 939, 943 (4 Cir.), *cert. denied,* 374 U.S. 831, 83 S.Ct. 1873, 10 L.Ed.2d 1054 (1963). But here, Polytarides had already manifested his intent to transfer the guns to the Iraqi government and the Texas firearms dealers had specifically warned him that these actions would be illegal. Because Polytarides had taken significant steps to transfer the guns and had been warned of the illegality of his potential actions, proof of Friedland's subsequent advice did not create a sufficient factual basis for instructing the jury on the defense of criminal action taken on the advice of counsel and, therefore, the court's refusal to give the requested instruction was not error. *See United States v. Hoopes,* 545 F.2d 721 (10 Cir. 1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 270 (1977).

Polytarides' final argument concerns the trial judge's refusal to grant a mistrial based upon the prosecutor's allegedly improper rebuttal jury summation. On cross-examination Polytarides had admitted that he thought that the Iraqi government would use the guns for an illegal purpose. This admission came during the following questions and answers:

"Q. What did you gather these guns were going to be used for?

"A. Well, from the things that they had asked me—because when they asked me together with the machine guns and also for the silencers to be equipped with machine guns, I gathered they would not be used for a legal purpose and I told them that.

"Q. So, in other words, you gathered they were going to be used for an illegal purpose, is that correct.

"A. Well, for silencers—I can't understand, you know, for a police force indicating they wanted them for security purposes—what would be the use of a silencer for a security purpose.

"Q. Did you ever mention to anybody anything about the Oil Minister's meeting in Kuwait." (Tr. 673–674)

Defense counsel immediately objected and the objection was overruled. Polytarides answered the question by stating that he told a federal agent that "that was my idea." (Tr. 675) There followed another objection by defense counsel and, after a discussion at the bench, the court sustained an objection, apparently insofar as we can determine from the materials provided on appeal, to further interrogation of defendant along this line. The judge, however, was not requested to, nor did he, instruct the jury to disregard defendant's previous answer regarding the Oil Minister's meeting in Kuwait and defendant's answer remained in evidence. In the course of the government's argument to the jury near the close of the trial the prosecutor stated:

I said, did you have any idea what these guns would be used for—he said, I gathered it had something to do with the Oil Ministers in Kuwait. I gathered it would be for illegal purposes because they deal with silencers.

Defense counsel made no contemporaneous objection to the prosecutor's remark, but, after the conclusion of the prosecutor's rebuttal argument, he moved for a mistrial. It appears that thereafter the judge asked defense counsel if he wanted a curative instruction and defense counsel indicated that he would not request it.[2] Neverthe-

2. The excerpt of the trial transcript wherein defense counsel moved for a mistrial was not included as part of the official record on appeal. Nor was the motion for a mistrial mentioned or included in the official docket entries. Appellant did attempt to reproduce this portion of the transcript in the appendix filed with his brief.

The judge's offer of a curative instruction does not appear either in the official record or in appellant's appendix, but was referred to by defense counsel in the transcript of defendant's sentencing and again in the government's brief on appeal.

less, defense counsel again raised the issue of the alleged impropriety of the prosecutor's rebuttal argument at the time of sentencing by way of a motion for judgment of acquittal or, in the alternative, for a new trial.

Polytarides contends that the prosecutor's rebuttal argument to the jury misstated his testimony and interjected an emotional factor into the proceedings that was so prejudicial to the defense as to require a mistrial. He argues that the prosecution strongly inferred that the guns were to be used to assassinate the Oil Ministers in Kuwait.

The government contends that this was fair comment on the evidence and was in direct response to defense counsel's closing argument that Polytarides' violation of the law was, at most, only a technical one and no one was harmed thereby.

■ We conclude that the prosecutor's statement, if improper, was not so grievous as to require the granting of a motion for a mistrial. Counsel sat silently throughout the entire rebuttal argument and did not attempt to intervene and object. Only after the prosecutor concluded his argument did counsel act, and then it was not to request a curative instruction, but to move for a mistrial. We are of the opinion that granting a timely request for a curative instruction would have sufficiently removed any possible prejudice to the defendant from the prosecutor's comments. *United States v. Elmore,* 423 F.2d 775, 780–781 (4 Cir.), *cert. denied,* 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970).

Accordingly, the judgment of the district court is affirmed.

*Affirmed.*