**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lonnie Glen SCHMIDT,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas Calvin DUNLAP, Sr.,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Eugene LEWIS,
Defendant–Appellant.**

Nos. 90–5902 to 90–5904.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1991.

Decided June 11, 1991.

As Amended July 15, 1991.

Kenneth Andresen, Charlotte, N.C., for defendant-appellant Lewis.

James F. Wyatt, III, Charlotte, N.C., for defendant-appellant Dunlap.

George V. Laughrun, II, Charlotte, N.C., for defendant-appellant Schmidt.

Brett Mary Dignam, Tax Div., U.S. Dept. of Justice, Washington, D.C., argued (Shirley D. Peterson, Asst. Atty. Gen., Robert E. Lindsay, Alan Hechtkopf, Tax Div., U.S. Dept. of Justice, Washington, D.C., Thomas J. Ashcraft, U.S. Atty., Charlotte, N.C., on brief), for plaintiff-appellee.

Before HALL and MURNAGHAN, Circuit Judges, and KISER, United States District Judge for the Western District of Virginia, sitting by designation.

MURNAGHAN, Circuit Judge:

Appellants Lonnie Schmidt (Schmidt), Thomas Dunlap, Sr. (Dunlap), and James Lewis (Lewis) were convicted in the United States District Court for the Western District of North Carolina on sixteen conspiracy and substantive counts of various federal tax violations stemming from a scheme to sell trusts known as Unincorporated Business Organizations (UBOs). Partici-pants in the UBOs could assign income and assets to the trusts and take otherwise unavailable deductions for purely personal expenses and could further avoid the payment of taxes on income by effecting "distributions" of their income to a financial institution in the Marshall Islands. Schmidt, Dunlap, and Lewis have appealed, raising various points of error.

I.

In early 1986, appellant Schmidt devised and promoted a plan to sell putative trusts known as UBOs and sold them, for commissions, to others. Schmidt described the UBO to potential customers as

a domestic trust wherein the trustee or the individual for whose benefit truly [it] is set up for, has total control, whether it's real estate, real property, personal property, he can buy and sell as fast as he can control it normally as an individual.

He's got total control. He still has the ability to defray all the taxes down to an absolute zero * * *.

Working in conjunction with Schmidt, appellants Lewis and Dunlap sold UBOs to at least 20 investors at a cost of between $3500 and $5000 apiece, assuring such investors that purchasing a UBO would permit them to pay whatever taxes they wanted to pay.

In a typical UBO scheme, an investor would name himself trustee of his own UBO. Appellants advised the trustee that he could transfer to a UBO all earnings (including income normally reported on a W–2 or 1099 form as individual income) and assets (including real property, automobiles and personal wardrobe). While ownership of such earnings and assets was apparently transferred to the UBO, their control remained in the hands of the investor as "trustee." Appellants instructed UBO owners to take an inventory of personal property and to keep minutes documenting all UBO expenses, including purely personal expenses for household items, car repairs, groceries, clothing, and entertainment, assuring the investors that all such expenses constituted proper UBO business

deductions which could legitimately be used to reduce taxable income earned by the UBO. Appellants also encouraged UBO purchasers to take the original cost of UBOs as a deduction on their individual returns.

In an effort further to legitimize the separate and distinct character of the UBOs, appellants instructed investors to establish non-interest-bearing checking accounts in the names of their organizations. They also recommended that investors, as trustees, apply to the Internal Revenue Service (IRS) for employer identification numbers to assign to the accounts so as to avoid using trustees' individual social security numbers.

Schmidt promoted First Surety Bank, Ltd. (FSBL), an "offshore entity" (Marshall Islands) that was not subject to U.S. tax jurisdiction and that would refuse any inquiries that came from the IRS, as a principal distinctive feature of his trust package. UBO investors subsequently named FSBL as the beneficiary of their UBOs and received signature cards for numbered accounts there. Appellants then encouraged investors to make "income distributions" to FSBL at the end of each year. The so-called "distributions" were used by investors in further reducing taxable income remaining in UBOs after payment of the investors' personal expenses. Investors were told that, by sending the money to FSBL, they could eliminate the paper trail but retain control over "a hundred percent" of their funds. FSBL would make mortgage or other payments on behalf of an investor/trustee, sell the investor a certificate of deposit at a 23% interest rate or, upon request, return the money within several weeks to a domestic UBO checking account under the investor's control.

Most problematic was the advice appellants gave UBO investors regarding compliance with the federal income tax laws. Based upon such advice, UBO investors who filed individual income tax returns (Forms 1040) omitted substantial amounts of income, including W–2 income, that appellants instructed investors to consider as UBO income. Although the income report-

ed generated tax, that tax was typically less than the amount withheld, and refunds were claimed. UBO investors also submitted federal fiduciary returns (Forms 1041) listing income that, in fact, did not belong beneficially to the UBOs and then claimed deductions which eliminated or drastically reduced the taxes due. The purported deductions included expenses for home improvements, groceries, clothing, entertainment, and other purely personal living expenses, as well as deductions for income distributions where the investor continued to control the putatively distributed funds.

On August 10, 1989, appellants were charged in a seventeen-count indictment. Count 1 charged all appellants with willfully conspiring to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the IRS in violation of 18 U.S.C. § 371. Counts 2 through 6 charged appellant Lewis with willfully aiding and assisting the preparation of false tax returns in violation of 26 U.S.C. § 7206(2). Counts 7 through 10 charged Lewis with willfully failing to file income tax returns for taxable years 1983, 1984, 1985, and 1986, in violation of 26 U.S.C. § 7203. Count 11 charged all appellants with conspiring to commit witness tampering in violation of 18 U.S.C. § 371, 1512(b), and 2. Counts 12 through 14 charged Lewis and Schmidt, and Counts 15 through 17 charged Dunlap and Schmidt, with attempting corruptly to influence grand jury witnesses, in violation of 18 U.S.C. § 371, 1512(b), and 2.

On February 1, 1990, appellants moved to dismiss the indictment on the grounds that it was based on alleged tax law violations which were vague and highly debatable, and that, as a latter of law, the indictment was defective. On February 6, 1990, appellants filed an additional motion to dismiss the indictment on the ground that alleged prosecutorial misconduct during the grand jury process had deprived them of their constitutional right to due process. On February 13, 1990, the district court entered an order denying the motion to dismiss the indictment on the basis of prosecutorial misconduct. The court issued its

opinion denying the motion to dismiss the indictment on the basis of vagueness and fatal defect on February 14, 1990. *United States v. Lewis,* 730 F.Supp. 691 (W.D.N.C. 1990).

The jury returned guilty verdicts on Counts 1 through 16 and acquitted Dunlap and Schmidt on Count 17.

On April 12, 1990, the District Court sentenced Schmidt to serve one hundred and eight (108) months, to be followed by a three year term of supervised release, and to pay a $30,000 fine and a $350 special assessment. Lewis was sentenced to serve fiftyseven (57) months on Counts 1, 3, 4, 6, 11, 12, 13, and 14 (the Guideline counts) and a consecutive three-year term on Counts 2, 5, 7, 8, 9, and 10 (the non-Guideline counts), to be followed by a three-year term of supervised release, and to pay a $20,000 fine and a special assessment of $700. Dunlap was sentenced to serve eighty-four (84) months, to be followed by a three-year term of supervised release, and to pay a $30,000 fine and a special assessment of $200. Each appellant filed a timely notice of appeal.

The points of error raised on appeal are that 1) the district court erred by denying the motion to dismiss the indictment for alleged prosecutorial misconduct, 2) Counts 1 through 6 of the indictment were fatally defective because they were labelled as sham organizations though they possessed some defensible purposes, 3) the district court erred in refusing to give appellants' requested instruction concerning the definition of a sham, 4) Counts 1 through 6 of the indictment were based on law that was vague or highly debatable, 5) the district court erred by refusing to give appellants' proposed jury instruction concerning reliance on experts, 6) the district court erred by refusing to instruct the jury on selective prosecution, 7) the district court misapplied section 2T1.3 of the Sentencing Guidelines in determining the base offense level for the appellants' conspiracy convictions and in determining a two point enhancement for Dunlap, and 8) there was insufficient evidence to support the verdicts on Counts 11 through 16.

## II.

Throughout a number of the claimed errors there runs a common thread. Two cases involving civil aspects where existence, "sham or no," is a question of fact which the appellants seek to build on, ignoring that a criminal case such as the one with which we here deal turns not on the characterization of the UBO but on whether, sham or not, the UBO was used to conceal income and assets in a fraudulent manner.

### A. *The Prosecutor's Remarks Before the Grand Jury*

■ Appellants have begun by contending that the district court erred in refusing to dismiss the indictment on the ground of prosecutorial misconduct. Specifically, appellants have argued that the question of whether a UBO constitutes a sham transaction is a question of fact, citing *Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) and *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89 (4th Cir.1985), and that the prosecutor took such finding of fact away from the grand jury through conclusory statements before several witnesses to the effect that the alleged transactions in the instant case were shams as a matter of law.

Appellants considered the following exchange between the government and witness Joyce Williams as most vividly illustrating the prosecution's encroachment on the fact-finding role entrusted to the grand jury:

A. I've just got to the point where I don't know—I don't know whether it's legal or not, to tell you the truth.

Q. I'll tell you it's not. As a matter of law it is not legal.

A. That's what I asked Mr. Horowitz [an attorney], and he said right off the top of his head he didn't think it was, but he could not say for sure.

Q. I'll tell you that not just off the top of my head but according to criminal cases and general cases for many years on the nature of trusts, Number One, the trust instrument itself is in-

valid on its face, and any competent lawyer will tell you that, because it does not specify a beneficiary.

Number Two, these types of trusts where you supposedly transfer your corpus into the trust and keep total dominion and control have been recognized as sham trusts for over 50 years. That means that were you to be audited yourself, according to the cases, you could be assessed not just back taxes for any taxes you hadn't paid, because that's all your income, it's not trust income, it's your income and your husband's income, you'd be assessed a negligent penalty, and that's been upheld in a number of cases.

Also, investors have been prosecuted successfully for joining this trust. That's prosecution, that's criminal. There's several recent cases about it, so the answer to your question is as a matter of law it is not legal.

And for the benefit of the grand jury, I'll say I'm explaining about criminal prosecution to make it clear what the law is. That does not say that these particular defendants necessarily, or proposed defendants, have committed any wrongdoing. You have to look at the independent evidence, which we'll present to you and have been presenting to you in this grand jury. Does this answer your question about the legality, Ma'am?

A. (Nodded head up and down.)

The prosecutor made similar, although not as extensive, statements regarding the illegality of certain aspects of trusts set up by grand jury witnesses Seton Fairless and Myra Poplin.

Appellants further have attacked the prosecution's statement of the law before witness Fairless as post-dating the actual commission of the offenses, concluding that the appellants themselves could not possibly have been on notice as to the illegality of the UBO transactions.[1] Finally, appellants have emphasized the fact that the prosecutor failed to mention the *Frank Lyon* case during his final request for instructions as further indication of his intent to take the factual question of a sham transaction *vel non* from the jury, leaving the jurors to decide only whether appellants had acted in concert.

The appellants have pointed to the existence of numerous non-tax considerations offered by various witnesses before the grand jury to demonstrate how the jury could have concluded that the UBO's were not shams because they were not "shaped solely by tax avoidance considerations." *Rice's Toyota World, Inc.,* 752 F.2d at 92; *Frank Lyon,* 435 U.S. at 583–84, 98 S.Ct. at 1303. At least nine witnesses testified that their primary motivations for purchasing the UBO's included protection of assets from creditors, privacy, and estate planning considerations. In view of such evidence, appellants contended that it would be impossible to perceive the prosecutor's usurpation of the grand jury's role as harmless error, and that such usurpation adversely affected their right to a fair trial, citing *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) and *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986).

The fundamental flaw in the appellant's line of reasoning has been their misapprehension of the nature of the sham at issue by relying inordinately on *Frank Lyon.*

In *Frank Lyon,* the question presented focused on the taxpayer's ability to claim deductions in connection with a multiple party sale-and-leaseback transaction. The ability of the taxpayer to take the deductions depended in turn upon the Court's determination of the transaction itself as a sham. In the instant case, however, the appellants were charged with conspiring to defraud the United States "by using sham trust entities known as UBO's to conceal taxable assets from the [IRS]." And in order to indict and try the appellants on such a charge, it was not necessary for the

---

1. The prosecutor cited *United States v. Brodie,* 858 F.2d 492 (9th Cir.1988) and *United States v. Krall,* 835 F.2d 711 (8th Cir.1988). Each of the UBOs at issue was sold before those opinions were decided.

grand jury to determine whether the UBOs constituted sham transactions under *Frank Lyon.* Whether a UBO itself would be held to be a sham is of no moment; here it was the fact that the UBOs, whether in other respects sham entities or not, were used to conceal income and assets in a fraudulent manner which made the scheme illegal.

The important distinction between civil and criminal tax cases concerning the key element to be focused upon is compellingly set out in *United States v. Miller,* 545 F.2d 1204, 1214 (9th Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). There the Ninth Circuit noted,

> In civil tax cases the purpose is tax collection and the *key issue is the establishment of the amount of tax owed by the taxpayer.* In a criminal tax proceeding the concern is not over the type or the specific amount of the tax which the defendant has evaded, but *whether he has wilfully attempted to evade the payment or assessment of a tax....* The difficulty in *automatically* applying the constructive distribution rules to this case is that it completely ignores one essential element of the crime charged: the willful intent to evade taxes, and concentrates solely on the issue of the nature of the funds diverted. That latter aspect is not the important element. Where the taxpayer has sought to conceal income by filing a false return, he has violated the tax evasion statutes. It does not matter that that amount could have somehow been made non-taxable if the taxpayer had proceeded on a different course.

*Id.* at 1214 (emphasis in original) (footnote omitted). Thus, the technical considerations present in *Frank Lyon* and *Rice's Toyota World,* both civil cases, focusing on the allowability of deductions in sale-and-leaseback transactions based upon the nonexistence of any legitimate business purpose, are inapposite. Appellants would have us read those cases as standing for the unsound proposition that a criminal defendant cannot be convicted of tax fraud and evasion so long as he can demonstrate the existence of any legitimate business purpose for, or viable economic consequence of, the transaction regardless of other, not-so-commendable purposes as may have been present.

■ Moreover, the statements made by the prosecutor before the three grand jury witnesses did not amount to taking the sham question out of the jury's hands. In his colloquy with Joyce Williams, the prosecutor was careful to remind the grand jury that he was only stating the law in response to various facts and circumstances offered by the witnesses, and that the task of applying the law so stated to the evidence presented as to the appellants remained with the grand jury.[2]

**B.** *The Indictment's Allegations of Unlawful Conduct in Counts 1 through 6*

■ Again, some aspects not illegal—the possessing of three non-tax business purposes—regardless of the illegality of others, have been claimed to render the counts fatally defective.

Thus, because the indictment itself states that the appellants 1) encouraged UBO investors to place all of their assets into the UBOs and outside the reach of potential creditors, including the IRS; 2) represented to potential investors that the UBOs would "assure total privacy"; and 3) told potential investors that they would receive "23% interest" from the purchase of certificates of deposit, the counts should be dismissed.[3]

---

**2.** We would also note that a post-verdict claim of prosecutorial interference with the grand jury's determination of probable cause is rendered harmless by the verdict of the petit jury; *United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 941, 89 L.Ed.2d 50 (1986); unless the defect is "so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment."

*Midland Asphalt Corp. v. United States,* 489 U.S. 794, 802, 109 S.Ct. 1494, 1499–500, 103 L.Ed.2d 879 (1989). We find no such fundamental defect here.

**3.** The appellants have contended that the indictment failed to allege necessarily unlawful conduct, and indeed actually alleged lawful activity.

*See, e.g., Current v. United States,* 287 F.2d 268, 269–70 (9th Cir.1961).

Appellants' contentions to that effect are of no merit. Counts 2 through 6 of the indictment did not refer to sham status nor did they refer to Count 1. Counts 2 through 6, therefore, did not recite any of the business purposes allegedly mentioned in Count 1. Therefore, appellants' assertion of fatal defect is not to be considered with respect to Counts 2 through 6. *United States v. Duncan,* 598 F.2d 839, 849 n. 5 (4th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979) (each count of indictment must stand or fall alone, except insofar as the allegations of another count are incorporated by reference).

■ The conspiracy count, Count 1, on the other hand, was not defective even assuming it did allege that the UBOs had some business purpose. As we have previously pointed out, an agreement to conceal income and assets from the IRS constitutes a conspiracy to defraud the United States whether or not the entities used are shams.

The indictment alleged that the appellants *represented* to potential investors that a legitimate business purpose existed. "Such representations could not be characterized as an objective determination that a valid business purpose existed." *United States v. Lewis,* 730 F.Supp. 691, 695 (W.D. N.C.1990). Thus we find no fatal flaw in the language of the indictment as to Counts 1 through 6.

## C. *Refusal To Instruct the Jury on the Legal Definition of "Sham"*

■ Yet again, appellants have invoked their *Frank Lyon/Rice's Toyota World* interpretation of "sham" to insist that the district court erred in not giving a jury instruction to that effect as to the conspiracy count (Count 1), but chose instead to give the following instruction:

> Now, when we look at the object of the conspiracy to obstruct the collection of Federal income taxes, using and causing to be used sham trust entities known as UBOs to conceal taxable income and assets from the IRS, as is stated on page 2 of paragraph eight … the utilization of numerous sham trusts as stated in paragraph nine and on page 2, and the promotion and selling of [a] sham trust scheme as a device to allow individuals not only to evade Federal income tax liabilities but also to escape detection for so doing as stated in paragraph 29 on page 8.

> Simply put, if after considering all the evidence you find the Government has proved beyond a reasonable doubt that the unincorporated business organization trust being sold, promoted, used and caused to be used by the defendants were a scheme to be used by the individuals as a device for evasion of their income tax liabilities and were not for legitimate purposes as contended by the defendants, then you will have found that the *use of the UBOs as promoted and sold by the defendants were a sham used for the object and as a means and methods of impeding and obstructing the Internal Revenue Service in the ascertainment and collection of Federal income taxes.*

(Emphasis added.) We have emphasized the final portion of the district court's instruction on the definition of "sham" to highlight again the distinction between the UBO as sham (*Frank Lyon*) and the *use* of the UBO as sham (the instant case). Giving no consideration to such an important distinction, the appellants have continued to urge that the instruction as given was flawed because it 1) made no reference to a non-business purpose and 2)· made no reference to economic substance, the two prongs of the *Frank Lyon* "sham" test.

A trial court is not required to give a requested instruction unless there is an evidentiary basis for the instruction and the instruction correctly states the law. *United States v. Dornhofer,* 859 F.2d 1195, 1199 (4th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989). The instruction rejected by the district court provided in part that to find appellants guilty, the jury would have to find "that the UBO at issue is, in fact, a sham." As we have previously shown, that

simply was not the law setting forth what the government had to prove.

Had appellants chosen to quote the remainder of the district court's instruction regarding how the UBO's were used illegally, their *Frank Lyon* argument would all but vanish. The district court cogently set forth the two essential elements of tax evasion schemes: 1) whether the taxpayer intended to escape taxes or wages on his earnings by assigning, transferring, selling, or giving away some or all of his future earnings to another individual or entity, and 2) whether the taxpayer continued to maintain dominion and control over his assets after transfer to such "entity." It was a violation of well-established principles of tax law that provided the basis of appellants' convictions, rendering inappropriate the appellants' proposed jury instruction.

## D. The "Vagueness and High Debatability" of the Law Regarding UBOs

■ Here appellants sought to depend on *United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974), in which we held that "when [a] law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *Id.* at 1162.

Appellants have maintained that the government can point to no statute, regulation, or court decision that could have served to give appellants fair warning that the sale of UBOs was criminal, because here questions of tax liability revolved around the subsequent taking of deductions against income generated by the UBOs, an area of the law supposedly riddled by vague and highly debatable interpretations of such portions of the tax code as those permitting the deduction of meals and lodging expenses, 26 U.S.C. § 119, and

the deduction for ordinary and necessary business expenses, *id.* at § 162.

Here again, appellants have sought to divert attention away from the well-settled law of what constitutes tax evasion and into the misty realm of UBOs and deductions against personal income. By properly focusing on pertinent tenets of tax law—that earned income is taxable to those who earn it and that dominion and control over property, rather than documentary title, determines to whom the income from that property is taxable—one discovers a number of cases. *See Holman v. Holman*, 728 F.2d 462 (10th Cir.1984) (assignment of income doctrine and grantor trust provisions applied to hold trusts mere shams for tax avoidance purposes); *Hanson v. Commissioner*, 696 F.2d 1232 (9th Cir.1983) (same); *Schulz v. Commissioner*, 686 F.2d 490 (7th Cir.1982) (same); *Vnuk v. Commissioner*, 621 F.2d 1318 (8th Cir.1980) (same); *Wesenberg v. Commissioner*, 69 T.C. 1005 (1978) (same); *Zmuda v. Commissioner*, 731 F.2d 1417 (9th Cir.1984) (investors, as trustees, had complete control over the income-producing property of the trusts).[4] Hence, contentions of vagueness and debatability simply do not hold up.

## E. Instruction Regarding Reliance Upon Experts

■ Moving from the attempt analytically to make controlling the *Frank Lyon* definition of sham, appellants next have contended that the district court erred in declining to submit a jury instruction regarding the defense of reliance upon certain experts. Each appellant sought an instruction whereby the jury could not find willful wrongdoing if it found that each had acted upon the basis of advice from an expert or experts in the tax field. The instructions were denied.

4. At oral argument, counsel for appellants attempted to attack the government's reliance on the line of cases set forth here by again invoking appellants' *Frank Lyon* argument; that is, because the line of cases found the trusts themselves to be shams, their reach could not include the conduct of the appellants, where a legitimate business purpose or economic substance might be demonstrated. Yet the purpose in citing the cases here is merely to point out that evasions of taxes may be found where the *use* of an arguably legitimate trust (which for the purposes of argument we assume, without deciding) results in violation of the basic tenets of federal taxation at issue in each of those cases.

Appellant Dunlap testified at trial that he had solicited and relied upon the advice of an accountant named Elizabeth Austin in the preparation of his 1987 trust return and the trust returns of his sisters, his brother, and Daniel Smith, all individuals to whom he had sold UBOs.

Schmidt and Lewis made similar contentions of reliance upon accountants and attorneys in their own testimony. Lewis claimed that he sought the advice of Darlene Baker, his tax preparer, and the advice of attorneys at the legal department for the Amway Corporation, for whom Lewis was a distributor. Baker testified that, in 1987, she researched the issue of whether personal expenses were deductible on a trust tax return, and concluded that they were. Elizabeth Hines and Richard Waak, members of Amway's legal department, testified that they corresponded with Lewis concerning his request to transfer his Amway distributorship into a UBO. They approved the transfer, but admitted that they did not review in depth the legality of the use of the UBO itself.

Schmidt contended that the evidence shows that he consulted several attorneys before he began promoting UBOs.

■■■ Returning again to the jury instruction standard, a district court may not refuse a theory of defense instruction *if* such instruction has an evidentiary foundation and is an accurate statement of the law. *Dornhofer*, 859 F.2d at 1199. As to the law itself, the essential elements of a reliance defense are 1) full disclosure of all pertinent facts to an expert and 2) good faith reliance on the expert's advice. *United States v. Miller*, 658 F.2d 235, 237 (4th Cir.1981).

Here the district court properly refused the requested instructions in the face of inadequate evidentiary support. Dunlap admitted that he relied upon Austin only as to the legality of certain deductions, not upon the essential questions of what income could be assigned to a UBO or whether a trustee could maintain control and dominion over assets held in trust and not invalidate the trust for tax purposes. In addition, Dunlap sought Austin's advice only *after* he had bought a UBO and had sold UBOs to others. Thus, there was no evidence that he relied upon her advice regarding his future conduct. *See United States v. Polytarides*, 584 F.2d 1350, 1352–1353 (4th Cir.1978) (instruction properly refused because there was no evidence that the defendant sought advice on the lawfulness of possible future conduct).

Evidence of Lewis' reliance was similarly insufficient to support the jury charge; he sought no advice from his accountant on the assignability of income, on continued exercise of control over assets, or on future conduct. The Amway attorneys testified that they reviewed UBO documents only to ensure that they met the Amway distributorship requirements. They did not evaluate the legality of UBOs for federal or state tax purposes.

As for Schmidt, what little evidence there is in the record of consultations with attorneys shows only that he spurned such advice.

The willfulness and reliance instructions actually given by the district court—instructions in fact requested by appellants—were more suitably founded upon the evidence presented than the ones which the appellants claim, on appeal, they sought.

### F. Selective Prosecution

■■■ Appellants Dunlap and Lewis next asserted that the district court erred in refusing to instruct the jury on their claim of selective prosecution.

■■■ In order to establish a selective prosecution defense, a defendant must show that the prosecution brought against him had a discriminatory effect and was motivated by a discriminatory purpose. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). To succeed in such a showing, a defendant must demonstrate "both 1) that he has been 'singled out' while others similarly situated have not been prosecuted and 2) that the decision to prosecute him was 'invidious or in bad faith; i.e., based upon such impermissible considerations as race, religion, or the desire to exercise his consti-

tutional rights.'" *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir.1986) (citations omitted).

Dunlap and Lewis have contended that they offered evidence sufficient to satisfy both prongs of the *Greenwood* test. Arguably, both were prosecuted while at least five of each's peers were not. Each then has claimed that views they had made known regarding government corruption and the voluntary nature of compliance with the tax laws were protected speech and were known to the government when it made its decision to go forward with the prosecution.

We need not linger long in assessing the merits of the claim. It is well-settled that "[d]efenses and objections based on defects in the institution of the prosecution" must be raised prior to trial. *United States v. Taylor*, 562 F.2d 1345, 1356 (2d Cir.), *cert. denied sub nom, Salley v. United States*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977) (refusing to hear a selective prosecution claim raised for the first time on appeal); Fed.R.Crim.P. 12(b)(1). Lewis' and Dunlap's failure to comply with the requirements of Rule 12(b)(1) [5] constitutes a waiver by them of any claim that the prosecution was instituted for discriminatory reasons. *United States v. Aguilar*, 883 F.2d 662, 705 n. 44 (9th Cir.1989), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991); *United States v. Berrigan*, 482 F.2d 171, 174–176 (3d Cir.1973).

G. *Application of Sentencing Guidelines*

1. The Base Offense Level

■ Appellants contended during their sentencing hearing, and again now on appeal, that the base offense level calculated pursuant to Sentencing Guidelines Section 2T1.9(a), entitled "Conspiracy to Impair, Impede or Defeat Tax," should have been 10 and not 14 as the district court held.

Under Section 2T1.9(a), the base offense level is either 10 or the level determined under Sections 2T1.1 or 2T1.3 if either is applicable and results in a base offense level greater than 10. Section 2T1.1 is inapplicable because none of the appellants was charged under 26 U.S.C. § 7201. Section 2T1.3 provides, in pertinent part,

> *Fraud and False Statements Under Penalty of Perjury*
> (a) Base Offense Level:
> (1) Level from § 2T4.1 (Tax Table) corresponding to the tax loss, if the offense was committed in order to facilitate evasion of a tax; or
> (2) 6, otherwise.
> For purposes of this guideline, the "tax loss" is 28 percent of the amount by which the greater of gross income and taxable income was understated, plus 100 percent of the total amount of any false credits claimed against tax.

Approximately twenty individuals testified at trial that they had purchased UBOs from appellants. During the years that those individuals owned their UBOs, they filed trust tax returns (Form 1041) rather than individual income tax returns (Form 1040). However, the Internal Revenue Code specifically provides that the "gross income for a trust is determined in the same manner as that of an individual." 26 U.S.C. § 641(b). Accordingly, the UBO purchaser placed a gross income figure on his trust tax return that was identical to the figure that he should have placed on his individual tax return, except for the few individuals who used income distributions to understate their income.

At sentencing, the only figure the government presented to the district court was the total amount of all of the gross income that all of the UBO purchasers had listed on their trust tax returns: $1,144,-593.00. The district court took 28% of *that* figure to arrive at an offense level of 14 from the Tax Table, Section 2T4.1.

---

5. Rule 12(b)(1) provides,
 (b) Pretrial Motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Mo-
tions may be written or oral at the discretion of the judge. The following must be raised *prior to trial*:
 (1) Defenses and objections based on defects in the institution of the prosecution.

Appellants strenuously contend that the "tax loss" does not represent the total gross income reported because the bulk of that income was not understated. In other words, the UBO purchasers did not understate *all* of their income simply by reporting it on a trust return rather than an individual income tax return. In appellants' view, the understated income would be that portion of their gross income not reported because of nonlegitimate deductions plus any income "distributed" off-shore. Such a position, they urge, is consistent with the purpose of Section 2T1.-3(a), which is to calculate the amount of tax revenue that was not, but should have been, collected by the government. To recap the argument, if a UBO purchaser reports his gross income on a trust tax return instead of on an individual return, the total gross income figure is still reported to the government, and the tax loss is only 28 percent of the amount of deductions taken on the trust tax return that would have been disallowed on an individual tax return (plus 28% of any income distributions).

The government has replied that all of the gross income reported on the trust returns was properly treated as understated income, because, if, as has been shown, the use of the trusts was a sham, then the investors had no legitimate right to report *any* of their income on trust returns. In support of its position, the government relies solely upon a rather broad policy statement contained in the Introductory Commentary to Part T of the Guidelines:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with gravity of the offense should act as a deterrent to would-be violators.

With such policy as backdrop, the government has urged that 1) to allow appellants to offset understated individual income with falsely claimed, largely untaxed trust income would give an undue degree of approval to the very scheme for which they were convicted and 2) to treat income reported by UBO investors on trust returns as if it had been correctly reported on individual returns would thus subvert the deterrent purpose of the Guidelines set out above.

The choice before us is thus between punishing a crime whose gravity is represented by the actual loss of tax revenue to the IRS and one whose gravity is represented by the full extent of participation in a tax evasion scheme regardless of the tax consequences to the government. A fair reading of Section 2T1.3(a) supports only the former. The government simply is not suffering a "tax loss" merely because the taxpayer reports his income on a trust return rather than an individual return. Certainly such a theory would die of its own weight the minute the Service attempted to collect its "loss" by asserting a claim to all of the income reported on the trust tax returns. In our view, then, the understated gross income here is represented only by non-legitimate deductions and any income "distributed" off-shore to FSBL. We remand the case for a recalculation of all of the appellants' base offense levels consistent with our view of the *actual* tax loss sustained by the government.

2. Dunlap's Two Point Enhancement Based Upon Section 2T1.3(b)

 Dunlap has argued, and the government concedes, that the district court erred in enhancing his base offense level by two points pursuant to Section 2T1.3(b). That section provides, in pertinent part,

> (b) Specific Offense Characteristics:
> (1) If the defendant failed to report or to correctly identify the source of income exceeding $10,000 *in any year* from criminal activity, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(Emphasis added.) During the sentencing hearing, the case agent testified that Dunlap received no more than $8,000 in income from the sale of UBOs in 1987, no more than $2,000 in 1988, and conceded that if the relevant sentencing guidelines provided for an enhancement based upon the receipt of $10,000 in income per year from the sale of UBOs, such threshold was not met. Because the government concedes that no evidence exists to the contrary, it too concludes that the case should be remanded to resentence Dunlap. Thus, in addition to remand for recalculation of all appellants' base offense levels, the case is remanded for a recalculation of Dunlap's offense level absent the two-level enhancement under Section 2T1.3(b).

## H. *Sufficiency of the Evidence as to the Witness Tampering Counts*

█ In Counts 11 through 16 of the indictment, appellants were charged with conspiring to influence and attempting to influence or inhibit the testimony of five grand jury witnesses in violation of 18 U.S.C. § 1512(b). That title, in pertinent part, makes it illegal knowingly to use intimidation or physical force, threats, or corrupt persuasion to induce or attempt to induce or engage in misleading conduct with intent to influence, delay, or prevent the testimony of any person or cause or induce any person to withhold testimony or to withhold documents.

Appellants have asserted that § 1512 limits conduct which may serve as the basis for prosecution to tampering by specific means such as by use or attempted use of physical force or threat or by engaging in misleading conduct toward another person, and that such conduct does not include acts which are intended to mislead the government but which fail to mislead the person to whom the act was directed, citing *United States v. King*, 762 F.2d 232 (2d Cir. 1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1203, 89 L.Ed.2d 316 (1986). Having thus framed the legal standard, appellants then have contended that, even when viewed in a light most favorable to the government, the evidence adduced at trial was insuffi-cient to meet that standard beyond a reasonable doubt. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

The record reveals otherwise. Schmidt wrote letters dated September 23, 1988 to witnesses Myra Poplin, Margaret Stafford, and Frank Moore after he learned that each had been served with a grand jury subpoena. The letters instructed the witnesses about a purported "fiduciary relationship" each of them was "under" to FSBL and reminded them of the "written instructions from FSBL not to divulge any information regarding the assets or financial affairs of the trust to any third parties." In addition to the letters, Lewis spoke with each of the three over the phone, reminding each that he or she could exercise his or her Fifth Amendment rights, advising that each should send a copy of Schmidt's September 23 letter to the Assistant United States Attorney on the investigation, and urging that each should thereafter refer any inquiries to attorney Robert Keyser. Keyser was in fact unaware of the letters or of the use of his name by Schmidt.

There was also substantial evidence from which the jury could infer that Dunlap and Schmidt had misled Joyce Williams and Peggy Dunlap, appellant Dunlap's sister, regarding their obligation to testify and produce documents. Williams called appellant Dunlap, her brother, after receiving her first grand jury subpoena on February 6, 1989. She failed to appear on that date. She then asked for and was given a letter conferring "informal immunity" dated April 6, 1989. She appeared before the grand jury on the same day but she did not bring the documents listed in the subpoena with her and refused to testify.

On May 22, 1989, Williams was served with another subpoena to produce documents relating to her UBO and to testify on June 7, 1989. Declining to produce the requested documents, Williams instead sent the grand jury foreperson a document entitled "Answer to Subpoena/Purgation

by Oath," [6] which stated that she did not have any of the requested documents, including any relating to her UBO. She had, in fact, sent all of the documents to appellant Schmidt after the investigation began. Before the grand jury, Williams testified that appellant Dunlap had told her she would not have to testify if she submitted the "Purgation of Oath" form.

On June 7, 1989, the district court ordered Williams to appear and show cause why she should not be held in contempt for failure to appear before the grand jury. Shortly thereafter, Williams received a letter from appellant Schmidt dated June 10, 1989, purportedly acknowledging receipt, on behalf of FSBL, of Williams' UBO documents in early December 1988. On August 7, 1989, the district court issued an order compelling Williams to testify. She then told appellant Dunlap she needed the documents she had sent to appellant Schmidt back before the August grand jury session. The documents were returned to her after Dunlap called Schmidt, and ultimately, were produced to the grand jury.

On March 29, 1989, Peggy Dunlap received a subpoena to testify in April 1989. She refused to testify and was subpoenaed to testify again in June 1989. She spoke to her brother, appellant Dunlap, and to Schmidt after receiving the second subpoena. On Schmidt's advice, Peggy Dunlap submitted a "Purgation of Oath" form rather than appearing before the grand jury in June. On June 7, 1989, the district court ordered Peggy Dunlap to appear and to show cause why she should not be held in contempt for failing to appear before the grand jury. Shortly thereafter, she, like Williams, received a letter from Schmidt dated June 10, 1989, purportedly acknowledging receipt, on behalf of FSBL, of documents relating to her UBO in early April 1989. The documents were returned to her and were produced to the grand jury after her brother called Schmidt.

Having heard such evidence, especially when the evidence is viewed in a light most favorable to the government, the jury, as rational fact-finder, could clearly have found guilt beyond a reasonable doubt.

### III.

In conclusion, all aspects of the district court's judgment are affirmed, with the exception of appellants' sentences, which we vacate. The case is remanded for resentencing in accordance with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

K.K. HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in and join all parts of the majority opinion except Part II(G). The majority permits the appellants to profit from their own wrongdoing by offsetting unreported individual income with income fraudulently and illegally reported on the trust returns. The appellants encouraged investors to hide their personal income behind fictional business entities, argue on this appeal that the entities were not fictions, and yet have convinced the majority to treat them as fictional for purposes of sentencing.

Though the Sentencing Commission chose, perhaps unfortunately, to call its calculation "tax loss," it defined its calculation in terms of false statements. "Tax loss" is not intended to be an accurate accounting of the government's revenue deprivation:

> In order to gauge the seriousness of these offenses, the guidelines establish a rule for determining a "tax loss" based on the nature and magnitude of the false statements made. Use of this approach also avoids complex problems of proof and invasion of privacy when returns of

---

6. A purgatory oath is

> [a]n oath by which a person *purges* or clears himself from presumptions, charges or suspicions standing against him, or from a contempt.

Black's Law Dictionary 966 (5th ed. 1979) (emphasis in original).

persons other than the defendant and co-defendants are involved.

Commentary, U.S.S.G. § 2T1.3.

The commentary to U.S.S.G. § 2T1.9 also notes that "[a tax fraud conspiracy] typically is complex and may be far-reaching, making it quite difficult to evaluate the extent of the revenue loss caused."

The Commission's concerns are strikingly illustrated by this case. The appellants sold at least twenty UBOs, but the "tax loss" calculation used by the district court was based on only nine investors' returns. The extent of the revenue loss may never be known with any degree of precision. The majority opinion, aside from its rewarding the defendants the fruits of the fraud, creates the problems of proof the guidelines meant to avoid.

I respectfully dissent.