**In re Juan SANTAELLA, Debtor.**

**No. 00–16366–BKC–RAM.**

United States Bankruptcy Court,
S.D. Florida,
Southern Division.

Oct. 23, 2002.

gation uncovered the fraud and the material allegations have been proven at trial. The Surrender Motion is granted.

Mindy A. Mora, Bilzin Sumberg Dunn Baena Price & Axelrod, L.L.P., Miami, FL, for trustee.

Jay L. Alexander, Baker Botts, L.L.P., Washington, D.C., co-counsel for trustee.

Jeffrey T. Kucera, Ferrell Schultz Carter Zumpano & Fertel, P.A., Miami, FL, for debtor.

### ORDER GRANTING TRUSTEE'S MOTION TO COMPEL DEBTOR TO SURRENDER ESTATE PROPERTY

ROBERT A. MARK, Chief Judge.

Most debtors in bankruptcy cases are honest individuals with financial problems requiring and justifying relief under the Bankruptcy Code. Unfortunately, a small percentage of debtors abuse the system by seeking relief from their debts while hiding their assets. The debtor in this case, Juan Santaella (the "Debtor"), fits squarely in this small but dishonest group. As will be evident from the findings and conclusions in this Order granting the Trustee's Motion to Compel Surrender of Estate Property (the "Surrender Motion"), this Debtor has gone to great lengths to hide his assets, failing to disclose, among other things, real estate in Venezuela, a million dollar plus bank account in Switzerland, and his ownership and control of at least two offshore corporations, both with substantial assets. Moreover, reprehensibly, if not criminally, the Debtor attempted to conceal his ownership and control of these offshore corporations by creating, and executing documents in the names of, two individuals who do not exist. The Trustee's diligent and determined investi-

### Factual and Procedural Background

The Debtor filed a voluntary Chapter 7 petition for bankruptcy relief in this Court on July 19, 2000, describing his case as a "No Asset" bankruptcy. In his schedules, the Debtor disclosed various assets—including a home in Florida, several small bank accounts in Florida and Venezuela, and the shares of Valcorp Securities—each of which he claimed as exempt. May 8, 2002 Trial Exhibit 4 (hereafter "Exhibit__"). Shortly thereafter, at the Section 341 Meeting of Creditors, the Debtor unequivocally—and, it turns out, falsely—testified that he had included in his schedules all assets throughout the world in which he had an interest. Exhibit 102.

The Trustee sought substantial Rule 2004 discovery from the Debtor. In response to the Trustee's Rule 2004 notice in May 2001 for the disclosure of all financial accounts and all corporations in which the Debtor has held any legal or beneficial interest (Exhibit 6), the Debtor objected, claiming through his attorney that he had "already made full, complete, and repeated disclosure under oath of all assets that he, or companies in which he holds or held a controlling interest, owns or has owned during any relevant period of time." Exhibit 7. The Debtor thereafter filed a motion for protective order, asserting that his "compliance and cooperation have been exemplary", that he had "disclosed every asset in which he has a scintilla of an interest," and that there was nothing left to disclose. Docket Entry 124 at 8, 12.

In response to the Debtor's motion for protective order, the Trustee alleged—based in part on forensic handwriting analyses—that the Debtor was concealing his

ownership of at least two offshore companies—Santex, N.V. ("Santex") and Jaandsons Corporation ("Jaandsons")—through use of the aliases of "Hans Bauer" and "Jan De Vries." Docket Entries 126 & 128 at 11–14 & Tab 13. During the ensuing discovery hearing before Visiting Judge Thomas Utschig, the Debtor denied those allegations, testifying under oath that "Hans Bauer" and "Jan De Vries" were not aliases and that he had *never* signed either name. Exhibit 117B. Thereafter, on November 2, 2001, in response to "the (latest) subpoena recently served on Mr. Santaella," the Debtor provided the Trustee with three declarations purporting to be signed by "Hans Bauer" and "Jan De Vries." Exhibit 123. These purported declarations aver that "Hans Bauer" and "Jan De Vries" had signed all documents relating to Santex and Jaandsons on which their signatures appear, and that both companies were believed to belong to the Debtor's mother. *Id.* The Debtor also provided an *un*sworn statement, purportedly signed by his mother, asserting (i) that Santex belonged to her husband Hector Santaella and, upon his death, became hers; (ii) that she created Jaandsons; (iii) that neither Santex nor Jaandsons has ever belonged to the Debtor; and (iv) that "Hans Bauer" and "Jan De Vries" are known to her, and assist her in the management of Santex and Jaandsons. *Id.*

In early February 2002, the Trustee sought emergency ex parte relief in a motion entitled Ex Parte Motion for Relief from Debtor's Asset Concealment and Other Misconduct (the "TRO Motion"). The TRO Motion was supported by substantial evidence that the three "Hans Bauer" and "Jan De Vries" declarations had been falsified; that the Debtor was, in fact, using the aliases of "Hans Bauer" and "Jan De Vries" to conceal assets; that the Debtor was concealing documents evidenc-ing his financial affairs at his Valcorp Securities office; and that the Debtor had not disclosed approximately $1 million that he owned in a numbered Swiss account on the petition date, Account Number 230′086 WRI at Darier Hentsch & Cie in Switzerland (the "Swiss Account"). Based on the Trustee's showing, on February 11, 2002, the Court entered its Order Granting Ex Parte Motion for Relief From Debtor's Asset Concealment and Other Misconduct (the "Ex Parte Order") (Docket Entry 156). The Ex Parte Order authorized the Trustee to obtain access to the Debtor's business premises for the purpose of obtaining copies of documents, records and computer information. The Ex Parte Order allowed notice of such relief to be withheld from the Debtor and Debtor's counsel until access to the premises was accomplished. Finally, the Ex Parte Order set a show cause hearing as to why the debtor should not be held in civil contempt for failing to disclose assets.

Pursuant to this Court's authorization, the Trustee conducted an inspection of the Debtor's offices on February 11, 2002. Much of the evidence on which this Court now relies was obtained during that inspection. Thereafter, at the show cause hearing held on February 25, 2002, the Debtor accepted the Trustee's proffer that the Swiss Account contained at least $1,130,003 on the petition date. The Debtor and his wife granted a mortgage on their Florida homestead to secure full repayment of those funds to the estate. During the show cause hearing, the Trustee also advised the Court that documents obtained during his surprise inspection of the Debtor's offices confirmed that the Debtor owns Santex and Jaandsons, and that both of those entities possess valuable assets. To provide the Debtor an opportunity to meet the Trustee's allegations, the Court directed the Trustee to file a sepa-

rate motion against the Debtor requesting that he surrender estate property.

The Court's directive at the show cause hearing prompted the March 6, 2002 filing of the Surrender Motion presently before the Court. The Surrender Motion seeks an order directing the Debtor, *inter alia,* to (i) surrender a Caracas, Venezuela residence by the name of Residencias Jardin Los Granados ("Residencias Jardin"); (ii) surrender ownership of Santex, Jaandsons and their holdings; (iii) provide an accounting of the financial and operational activities of all such companies from January 1, 1994 to the present; and (iv) actively support the Trustee's effort to obtain information from third parties regarding estate assets. In response to the Surrender Motion, the Debtor (i) admitted ownership of Residencias Jardin, but claimed that it was exempt because he owned it with his wife as tenants by the entireties; (ii) failed to contest any of the Trustee's factual allegations, and (iii) objected to the Trustee's use of a turnover motion, rather than an adversary proceeding, to recover estate assets from the Debtor. This Court denied the Debtor's procedural objection in its April 29, 2002 Order Overruling Procedural Objection to Motion to Compel Surrender et al., and scheduled an evidentiary hearing for May 8, 2002.

The Court conducted an evidentiary hearing on May 8, 2002 on the Surrender Motion. The Court has fully considered the evidence, including the exhibits introduced into evidence[1] and the testimony and credibility of the witnesses. The Court has also considered the arguments of counsel at trial and the arguments embodied in each side's proposed findings of fact and conclusions of law submitted after the hearing.

### Summary of the Evidence

At the May 8th evidentiary hearing, in addition to several document custodians and foundational witnesses, the Trustee called five substantive witnesses:

1. *The Debtor, Juan Santaella*—The Debtor invoked the Fifth Amendment privilege against self-incrimination as to all of the factual issues in the Surrender Motion, and to all questions regarding his personal preparation of the documents recovered by the Trustee from his office files.

2. *Linda Hart*—Ms. Hart, a forensic document examiner, offered expert testimony that the purported signatures of "Hans Bauer" and "Jan De Vries" on the documents that she reviewed (except for the "Hans Bauer" and "Jan De Vries" declarations) were written by the Debtor. She testified that she reached this conclusion with "the highest level of certainty." May 8, 2002, Transcript at page 79 (hereafter "Tr. at ___"). She also testified that the purported signatures of "Hans Bauer" and "Jan De Vries" on the three notarized declarations were actually what the experts call "drawings" made by someone attempting to *simulate* the Debtor's "Hans Bauer" and "Jan De Vries" signatures.

3. *Gonzalo Santana*—Mr. Santana is a Venezuelan citizen and the Director of Security and Investigations for FOGADE. Mr. Santana also provided testimony bearing on the veracity and authenticity of the purported declarations of "Hans Bauer" and "Jan De Vries." Specifically, Mr. Santana testified that "cedula" numbers are unique Venezuelan identification numbers much like United States social security numbers. Based upon his investigation,

---

1. The Court is entering a separate Order Granting in Part and Denying in Part Debtor's Objections to Trustee's Exhibits.

Mr. Santana concluded that the cedula numbers listed on the declarations do not belong to "Hans Bauer" and "Jan De Vries," but to two entirely unrelated Venezuelan citizens (one of them a woman). Mr. Santana testified further that despite a diligent investigation, he and his office have been unable to locate anyone in Venezuela by the name of Jan De Vries, and that the one Hans Bauer they were able to locate had a different cedula number than, and bore no physical resemblance to, the "Hans Bauer" purportedly connected to Santex and Jaandsons.

4. *William McQuay*—Mr. McQuay is a certified latent fingerprint examiner. Mr. McQuay offered the expert opinion that the fingerprint obtained by the notary from the person who "signed" the "Hans Bauer" declaration came from the same finger as the fingerprint obtained by the notary from the person who "signed" the "Jan De Vries" declaration. Mr. McQuay testified that there was "no doubt in my mind it was made by the same person." Tr. at 138.

5. *The Trustee, Soneet Kapila*—Mr. Kapila testified regarding his forensic analysis of a series of bank accounts owned by Santex and Jaandsons. The Trustee's analysis, summarized through charts, provided evidence that the Debtor treated the Santex and Jaandsons bank accounts as his own during the period from June 1993 through February 2002 (the entire period for which the Trustee had documentation).

In addition to these witnesses, the Trustee offered more than 150 exhibits, many of which were recovered from the Debtor's office. As discussed more fully below, those documents provide compelling evidence of the Debtor's ownership of both Santex and Jaandsons. None of the Trustee's evidence—except for the falsified "Hans Bauer" and "Jan De Vries" declarations and the unsworn statement purporting to be from the Debtor's mother, all of which were procured by the Debtor—identifies anyone other than the Debtor, "Han Bauer," and "Jan De Vries" as having any involvement in the ownership or operation of Santex and Jaandsons.

The Debtor presented no defense other than cross examining the witnesses and objecting to the admissibility of numerous exhibits. Despite his earlier position that Santex and Jaandsons belong to his mother, the Debtor failed to produce her—or any other witness or exhibit—at the evidentiary hearing.

### *Discussion*

The Trustee argues that the Court can and should grant the Surrender Motion by default based upon the Debtor's postpetition egregious conduct during the discovery process, *citing In re Lawrence*, 251 B.R. 630 (S.D.Fla.2000), *aff'd*, 279 F.3d 1294 (11th Cir.2002). Certainly, the record does reveal substantial postpetition misconduct by the Debtor. Without even including the Debtor's failure to disclose his ownership of Santex and Jaandsons in the Debtor's parade of misconduct, the record evidence establishes that this Debtor has (i) concealed his ownership of a numbered Swiss account containing over $1 million; (ii) repeatedly lied under oath on his Schedule of Assets during the Section 341 Meeting of Creditors, during Rule 2004 examinations, and during a discovery hearing before this Court; (iii) participated in the preparation and submission to the Trustee of at least three falsified declarations; (iv) attempted to obstruct the Trustee's investigation by directing the recipient of at least one Rule 2004 subpoena not to comply; and (v) failed to produce the many documents evidencing his ownership and control of Santex, Jaandsons, their holdings and Residencias Jardin.

Notwithstanding the foregoing, the Court will not and need not grant the Surrender Motion by default. The Trustee has presented his case and proved the material allegations. Ruling by default is unnecessary.

### The Trustee Has Proven That The Debtor Owns and Presently Controls Santex, Jaandsons, Residencias Jardin and The Artwork

#### I. The Applicable Standard of Proof

To prevail in an action seeking to compel a debtor to surrender estate property, the Trustee bears the ultimate burden of proving (1) that the property at issue belongs to the bankruptcy estate, and (2) that the Debtor has the present power to surrender the property. *Lawrence*, 251 B.R. at 639. Once the Trustee makes out a prima facie case on these issues, the burden shifts to the Debtor to produce some evidence disputing the Trustee's prima facie case. *Id.* at 640. Although the parties agree on these issues relating to the burden of proof, they disagree on the applicable standard of proof. While this Court finds that the Trustee prevails under both a preponderance of the evidence standard of proof and a clear and convincing standard of proof, this Court holds that the preponderance of the evidence standard is all that need be satisfied.

The Court acknowledges that in a pair of rulings decided prior to 1950 under the 1898 Bankruptcy Code, the Supreme Court held that a Trustee must prove a turnover case by clear and convincing evidence. *Oriel v. Russell*, 278 U.S. 358, 362–63, 49 S.Ct. 173, 73 L.Ed. 419 (1929); *see also Maggio v. Zeitz*, 333 U.S. 56, 64, 68 S.Ct. 401, 92 L.Ed. 476 (1948) (citing *Oriel* for proposition that a clear and convincing standard of proof should apply to turnover actions). The Court reasoned that a Trustee's accusation that a debtor has knowing-

ly refused to turn over property to his bankruptcy estate is tantamount to a claim of fraud, and should be established by the "same kind of evidence required in a case of fraud in a court of equity." *Oriel*, 278 U.S. at 362–63, 49 S.Ct. 173.

More recently, however, the Supreme Court has emphasized that a preponderance of the evidence standard is presumptively applied in bankruptcy proceedings, like other civil matters, because that standard "results in a roughly equal allocation of the risk of error between litigants." *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Only when "particularly important individual interests or rights are at stake," the Court continued, should the movant in a civil proceeding bear a standard of proof higher than preponderance of the evidence. *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). Under current Supreme Court precedent, *Oriel's* clear and convincing standard is limited to a very narrow range of proceedings, such as those implicating an individual's right to freedom. *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *see also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights); *Woodby v. INS*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (deportation); *Mitsugi Nishikawa v. Dulles*, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958) (termination of U.S. citizenship). Matters of less fundamental import—even those that might result in "imposition of even severe civil sanctions"—only require "proof by a preponderance of the evidence." *Herman & MacLean*, 459 U.S. at 389–90, 103 S.Ct. 683.

In *Grogan*, the Court held that a debtor's interest in a bankruptcy discharge is insufficient to require a clear and convinc-

ing standard of proof in a complaint brought under 11 U.S.C. § 523(a)(2) seeking to except a debt from discharge based on fraud. *Grogan,* 498 U.S. at 286, 111 S.Ct. 654. Courts in this jurisdiction have followed *Grogan's* teaching and applied a preponderance of the evidence standard, rather than a clear and convincing standard, in bankruptcy proceedings where fraud was alleged in relation to (i) a conveyance of property, *In re American Way Service Corp.,* 229 B.R. 496, 525 (Bankr. S.D.Fla.1999); *In re Paul,* 217 B.R. 336, 337 n. 2 (S.D.Fla.1997); (ii) a debtor's claim of an exemption, *In re Miller,* 188 B.R. 302, 307 (Bankr.M.D.Fla.1995), and (iii) a complaint under 11 U.S.C. § 727 objecting to discharge, *In re Milam,* 172 B.R. 371, 374 (Bankr.M.D.Fla.1994).

This Court concludes that, under *Grogan* and its progeny, the preponderance of the evidence standard governs this turnover proceeding. Like the Section 523 action at issue in *Grogan,* this turnover proceeding only implicates the Debtor's right to property.

Some courts continue to apply a clear and convincing standard to turnover actions under the 1978 Code. *See, e.g., Evans v. Robbins,* 897 F.2d 966, 968 (8th Cir. 1990); *In re Lawrence,* 251 B.R. 630, 639 n. 7 (S.D.Fla.2000) (noting that the trustee did not contest use of the clear and convincing standard at the trial); *In re U.S.A. Diversified Products,* 193 B.R. 868, 872 (Bankr.N.D.Ind.1995), *aff'd* 100 F.3d 53 (7th Cir.1996). This Court's application of the lower preponderance of the evidence standard, however, is consistent with the growing weight of authority. *See, e.g., In re Vebeliunas,* 252 B.R. 878, 886 n. 9 (Bankr.S.D.N.Y.2000); *In re Clayton,* 235 B.R. 801, 806 n. 2 (Bankr.M.D.N.C.1998); *In re Quality Health Care,* 215 B.R. 543, 549 (Bankr.N.D.Ind.1997); *In re Alofs Manufacturing Co.,* 209 B.R. 83, 89–91

(Bankr.W.D.Mich.1997); *In re Sharon,* 200 B.R. 181, 199 (Bankr.S.D.Ohio 1996), *aff'd* 234 B.R. 676 (6th Cir. BAP 1999); *In re Patton,* 200 B.R. 172, 173–74 (Bankr. N.D.Ohio 1996); *In re Burkholder,* 177 B.R. 260, 262 (Bankr.N.D.Ohio 1995); *see also* Norton Bankruptcy Law & Practice 2d § 52:17 (West 2002) ("The applicable standard of proof in a turnover action is subject to debate, but courts are increasingly finding that a preponderance standard—not a clear-and-convincing standard—is appropriate.").

Despite concluding that a preponderance standard is applicable, the Court finds that the Trustee has prevented clear and convincing evidence so any contrary appellate view on the applicable standard would not change the outcome.

## II. Overwhelming Evidence Establishes The Debtor's Continuing Ownership of the Assets at Issue

To establish a prima facie case for turnover, the Trustee had to prove that the property in question was owned by Debtor on July 14, 2000, the filing date of his bankruptcy petition, and that the property continues to be in his possession and control. *See Leach v. Alley (In re Kirk Kabinets, Inc.),* 393 F.Supp. 798, 801 (M.D.Ga. 1975). As described below, the Trustee has presented substantial evidence of continuing ownership.

Pursuant to 11 U.S.C. § 541(a), all property in which the Debtor had a legal or equitable interest as of the commencement of his bankruptcy case, wherever located throughout the world and by whomever held, is property of the estate. In determining ownership, this Court is not bound to any particular formula, but considers all of the evidence and the inferences to be drawn from the evidence. The goal is to ensure that all property of the estate is available to meet a debtor's obli-

gations to creditors. Thus, while the means used to conceal assets may be as varied as the creative mind of the devious debtor who chooses to take advantage of the asset protection laws of a foreign jurisdiction, it remains the constant duty of this Court to pierce the implausible and recognize that which is true. *See In re Lawrence,* 227 B.R. 907, 917 (Bankr.S.D.Fla. 1998); *see also In re Lawrence,* 251 B.R. 630, 640 (S.D.Fla.2000), *aff'd,* 279 F.3d 1294 (11th Cir.2002) (recognizing court's duty to exercise its common sense); *In re Brooks,* 217 B.R. 98, 103 (Bankr.D.Conn. 1998) (holding that certain assets in offshore trust were assets of estate); *In re Portnoy,* 201 B.R. 685, 700–01 (Bankr. S.D.N.Y.1996) (refusing to permit Jersey Island law to defease debtor of assets held in a Jersey Island trust); *cf. FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1231 (9th Cir.1999) (affirming district court's rejection of contemnors' argument that Cook Islands trust law divested them of their ownership interest and noting that "a district court judge and his common sense" are not "easily parted").

■ Based on the overwhelming and uncontroverted evidence presented at the May 8, 2002, evidentiary hearing, the Court finds by clear and convincing evidence that "Hans Bauer" and "Jan De Vries" are aliases that the Debtor created and used in an attempt to conceal his ownership and control of Jaandsons and Santex. Additionally, the Court finds by clear and convincing evidence that the Debtor is, and has been at all times since prior to the initiation of this bankruptcy case, the owner of both Santex and Jaandsons.

As discussed more fully below, the evidence establishes, with respect to Santex, that the Debtor (i) has repeatedly and for many years asserted ownership over Santex; (ii) has managed and controlled the affairs of Santex; and (iii) has personally received the financial benefits of ownership in Santex. With respect to Jaandsons, the evidence establishes that the Debtor (i) incorporated Jaandsons in 1995 and received its single share certificate at that time; (ii) has managed and controlled the affairs of Jaandsons since; and (iii) has personally received the financial benefits of ownership in Jaandsons. These findings are fully corroborated by the reasonable inferences that this Court draws from (i) the documents that evidence the Debtor's clear control over these entities in his own name; (ii) the documents that evidence the debtor's control and ownership of these entities in the names of the Debtor's aliases; (iii) the Debtor's failure to present exculpatory evidence that, if it existed, would be exclusively in his control (such as pertinent testimony of his mother or documents evidencing any divestiture of Santex, Jaandsons or any of their holdings); (iv) repeated lies under oath throughout this case; (v) the Debtor's willful obstruction of the Trustee's investigation; and (vi) the Debtor's assertion of the Fifth Amendment as to all relevant questions relating to Santex, Jaandsons and their holdings.

## A. *"Hans Bauer" and "Jan De Vries" Are the Debtor's Aliases*

The Court finds that the Debtor has engaged in a scheme to conceal his control and ownership of Santex and Jaandsons by creating two fictitious identities—"Hans Bauer" and "Jan De Vries"—and then attempting to pass them off as real people who operate Santex and Jaandsons for the benefit of his mother. As part of this scheme, the Debtor knowingly and repeatedly committed perjury in this case and deliberately provided the Trustee with the three falsified "Hans Bauer" and "Jan De Vries" declarations in a blatant attempt to obstruct the Trustee's investigation.

*See* Exhibits 85, 86, 87 & 123. These findings are harsh but are based on the following unrefuted evidence.

First, the Debtor repeatedly testified under oath in Rule 2004 examinations and before this Court (during an August 2001 hearing in this case) that "Hans Bauer" and "Jan De Vries" are real persons. He provided detailed physical descriptions of each, and even claimed to have seen them both as recently as 1999 and 2000. Finally, the Debtor repeatedly testified that he has never signed the name of either "Jan De Vries" or "Hans Bauer." Exhibits 111, 112, 113, 117A, 117B. The Court finds all of that testimony to be false.

Second, the Debtor contradicted that portion of his own sworn testimony asserting that he had seen both "Hans Bauer" and "Jan De Vries" in 1999 (and 2000) by subsequently admitting in written answers to interrogatories that he had *not* seen either since 1994. *Compare* Exhibits 111 & 112 *with* Exhibit 123.

Third, beyond the appearance of their names in documents relating to Santex and Jaandsons, the Debtor did not offer a shred of independent evidence corroborating the existence of Messrs. Bauer and De Vries. Most obviously, no one purporting to be "Hans Bauer" or "Jan De Vries" appeared as a witness in the case, and no other witness testified that either of them actually exist. In light of the Debtor's lengthy association with "Hans Bauer" and "Jan De Vries" (at least on paper) and the seriousness of the allegations by the Trustee against the Debtor, the Court can imagine no plausible reason why the Debtor would not call "Hans" and "Jan" as witnesses if they actually existed.[2] Under the circumstances, the Debtor's failure to do so provides further support for the Court's conclusion that these individuals do not exist.

Fourth, the Court accepts and adopts the opinion of the Trustee's handwriting expert, Linda Hart. Specifically, Ms. Hart testified that each of the dozens of documents bearing the purported signatures of "Hans Bauer" and "Jan De Vries" that she analyzed were actually signed by the Debtor in the names of those aliases. May 8, 2002, Tr. at 45, 52, 58–62; *see also* Exhibits 93A, 93B, 93D & 93F. The Court finds Ms. Hart to be a qualified expert and a credible witness, and finds her conclusions to be persuasive and well grounded in fact. The Debtor challenged her methodology, but provided no competing expert testimony and no substantial basis for questioning the reliability of Ms. Hart's testimony. Near the conclusion of her testimony, the Court asked Ms. Hart to describe the degree of certainty of her opinion that the examples of Hans Bauer's and Jan De Vries' handwriting or signature were written by Mr. Santaella. Ms. Hart replied, "[t]hat's the highest level of certainty. I have *no doubt* based on the comparisons that I've conducted that they're one in the same writer." Tr. at 79, lines 9—11 (emphasis added). In short, Ms. Hart's testimony was strong and credible.

Fifth, other evidence strongly suggested that "Hans Bauer" and "Jan De Vries" are not real people. Gonzalo Santana testified that despite diligent efforts by himself and his staff at FOGADE, he was unable to locate anyone by the name of Jan De Vries living in Venezuela, and that the one Hans Bauer who they found was clearly a differ-

---

**2.** The Debtor had the chutzpah to propose a finding intended to weaken the Trustee's case, namely, "that neither Mr. Bauer nor Mr. De Vries was called to testify [by the Trustee] on May 8, 2002" (Debtor's Proposed Findings, p. 10). To suggest that the Trustee's proof was lacking because he did not locate and subpoena for trial two *fictitious* individuals is absurd.

ent individual than the one described by the Debtor as being involved with Santex and Jaandsons. Regardless of whether any individuals named Hans Bauer or Jan De Vries may exist, the Court finds that the "Hans Bauer" and "Jan De Vries" identities used in connection with the operation of Santex and Jaandsons are fictitious. The Court relies not only on the conclusions of the Trustee's handwriting expert, but also on the fact that the Venezuelan passports used by "Hans Bauer" and "Jan De Vries" to open a Jaandsons bank account at Southern Security Bank, and the Venezuelan cedula cards used by "Hans Bauer" and "Jan De Vries" to notarize their declarations, are all falsified. Not only do the cedula numbers on the two passports and the two cedula cards belong to persons by the names of Reinaldo Antonio Palacios and Floralba de Arellano Hernandez Quintero—and not Hans Bauer or Jan De Vries—but even the photograph of "Hans Bauer" on his purported passport bears no resemblance to the photograph of "Hans Bauer" on his purported cedula card. Exhibit 88; *compare* Exhibit 56 *with* Exhibit 89A.[3]

Sixth, the Court finds that the three declarations bearing the purported signatures of "Hans Bauer" and "Jan De Vries" are fraudulent. The Court credits the testimony of Linda Hart that the signatures on each of those declarations are not genuine signatures, but rather are labored drawings intended to imitate the Debtor's signatures for "Hans Bauer" and "Jan De Vries." May 8, 2002, Tr. at 53–54. The Court also credits the conclusions of a report by the Venezuelan Ministry of Interior that the cedula numbers used in those declarations to identify "Hans Bauer" and

"Jan De Vries" do not belong to either of them. Exhibit 88.

Seventh, as further support for the finding that the Bauer and De Vries declarations are fraudulent, the Court credits the testimony of latent fingerprint expert William McQuay. Mr. McQuay testified that the fingerprints that the Venezuelan notary obtained from "Hans Bauer" in order to notarize his declarations are from the same person who appeared before the notary as "Jan De Vries" in order to obtain notarization of the "Jan De Vries" declaration. May 8, 2002, Tr. at 138–42; *see* Exhibit 95; *see also* May 8, 2002, Tr. at 112. If signed by the same person, the Bauer and De Vries declarations are necessarily fraudulent.

The Court finds that the Debtor was personally involved in, and responsible for, the preparation of the fraudulent Bauer and De Vries declarations and (more generally) for the creation and perpetuation of these fraudulent identities. The Court bases this finding on (i) the fact that the Debtor (through his attorney) submitted the fraudulent declarations to the Trustee (Exhibit 123); (ii) the fact that a draft of the De Vries declaration, with a cover page addressed to the Debtor, was found by the Trustee during his inspection of the Debtor's office (Exhibit 91); and (iii) the inference arising from the debtor's invocation of his Fifth Amendment right.

Viewed in its entirety, the "Hans and Jan" evidence is, in itself, compelling evidence of the Debtor's ownership of Santex and Jaandsons. The Court finds that no person would go to such extraordinary lengths to perpetuate such an egregious scam without reason. Under the circumstances, the Court finds that the clear and only apparent reason for the Debtor's cha-

---

**3.** The Court credits the testimony of Mr. Santana that Venezuelan cedula numbers, like United States social security numbers, are used as a means of identification and that Venezuela assigns a unique cedula number to each person.

rade was to try to conceal the fact that he is the *only* person with any association to Santex and Jaandsons.

### B. *Santex and Jaandsons Are The Debtor's Companies*

Santex is a limited liability company established in the Netherlands Antilles in or about 1980. Exhibit 20B. Jaandsons is a company incorporated in the British Virgin Islands in June 1995. Exhibit 49.

1. *There Is Substantial Direct Evidence of The Debtor's Ownership of Santex and Jaandsons*

The Debtor's repeated admissions outside of this bankruptcy case over the course of more than a decade that he is the owner of Santex provide compelling direct evidence that he does, in fact, own Santex. First, from 1985 through 1989, the Debtor prepared a series of reports in which he identified Santex as a company that is "100 percent" owned by himself. Exhibits 12–15. Second, in 1995, the Debtor signed a letter to Hilda Morgade, a Miami accountant, admitting that Santex is "a company I own that is domiciled in Curacao." Exhibit 17. Third, in February 1998, the Debtor testified in a lawsuit that he was the indirect owner of Multinversiones (Exhibit 114B), a company that he concedes had been acquired by Santex several years earlier (Exhibit 114A). Fourth, while it is the Debtor's apparent story that Santex was owned by his father (Hector Santaella) until his death, and then transferred to his mother (*see* Exhibit 123), the Debtor signed a report of his and his father's respective shareholdings that lists Santex as a company in which the *Debtor*—and not his father—is the 100 percent shareholder. Exhibit 18. And fifth, there is no evidence or even a proffer anywhere in the record of any transaction by which the Debtor ever divested himself of his ownership of Santex.

■ The Court's conclusion is not weakened by the fact that the Trustee did not obtain the original bearer share certificates of Santex and Jaandsons. While production of the bearer share might be one form of evidence of ownership, it is certainly not the only (or even, in this Court's view, the most convincing) way to prove actual ownership. *See New York Land Co. v. Republic of Philippines*, 634 F.Supp. 279, 282 (S.D.N.Y.1986), *aff'd, sub nom. Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir.1986) (considering factors such as behavior and inferences drawn from documents in assessing owner of bearer share companies); *cf. United States v. Schmidt*, 935 F.2d 1440, 1448 (4th Cir.1991) (looking, in context of tax consequences, to substance rather than form, and explaining that "control over property, rather than documentary title" marks the true owner). It is the very nature of a bearer share company—indeed, its fundamental purpose—to promote anonymity of ownership. Once an individual obtains the necessary authorizations and approvals to act in the company's name, he is free to use the company to hold his assets, earn interest, conduct business and fund whatever expenses he chooses. Then, when it comes time for the shareholder to meet his responsibilities—such as to pay creditors or taxes—the "bearer share" form provides a convenient means of plausible deniability because the anonymous bearer share is safely locked away in some anonymous safety deposit box or in the hands of a trusted offshore agent.

The Court further finds, based in part on evidence that the Debtor possesses copies of the bearer share certificates for both Santex (Exhibit 20C) and Jaandsons (Exhibit 50), and in part on all of the findings contained herein, that the Debtor has custody or control of the original share certificates for Santex and Jaandsons. The Court finds no obvious explanation for why

the Debtor would possess copies of bearer shares for companies that he does not own—and the Debtor has offered no innocent explanation for their presence in his files. Moreover, it is certain that the Debtor has personally possessed the original Jaandsons share certificate because it was almost certainly the Debtor who personally signed the original certificate in the names of "Hans Bauer" and "Jan De Vries." *See* Exhibit 50.[4] Finally, given the Debtor's assertion that his mother owns both of these companies, the Debtor's failure to produce his mother (or any other witness) to assert ownership and control of the share certificates creates a strong inference that he, alone, owns and controls them.

## 2. *Other Evidence of the Debtor's Ownership Is Compelling*

Because bearer shares exist for the very purpose of promoting anonymity of ownership, the Court is also guided by evidence of who has treated the company as his own and who has enjoyed its financial benefits. Here, the evidence establishes that the Debtor has always enjoyed all of the ownership rights in Santex and Jaandsons.

## a. *The Debtor Exercised Exclusive Control of Both Companies*

All of the evidence presented identifies the Debtor—and no one else—as the person who has exercised *all* management and control over Santex and Jaandsons. Given the depths of the Debtor's involvement with these two companies, the Court concludes that the Debtor would have access to any proof of management or control by others if any such evidence existed. But the Debtor has presented none. Accordingly, the Court finds, as explained more

fully below, that the Debtor possesses complete, exclusive and unfettered control over Santex and Jaandsons.

With respect to Santex, the Debtor kept copies of the original incorporation papers in his office. Exhibits 20A—20D. Those documents reveal that on September 22, 1980, the same day that the Santex bearer share certificate was signed and issued, the Debtor and his wife were appointed as the company's sole attorneys-in-fact. Exhibits 20C & 20D. Although the Debtor's wife had an equal power of attorney for Santex, there is no evidence that she ever exercised any management or control over the company. By contrast, the Debtor has consistently exercised such control. The Debtor, alone, communicated with the corporate agent of Santex on "Santex, N.V." letterhead. Exhibit 21. The Debtor, alone, signed a $600,000 promissory note in the name of Santex. Exhibit 22. The Debtor, alone, controlled Santex's corporate bank accounts at Eastern National Bank in his own name or in the name of his "Hans Bauer" alias. Tr. at 180–183; Exhibit 29. The Debtor, alone, managed Santex's bank account at Guaranty Trust Bank in his own name. Exhibits 24–26. The Debtor, alone, issued, under his Hans Bauer alias, limited powers of attorney to Abdiel Mansfield to represent the interests of four Santex subsidiaries at their shareholders meetings in October 2000. Exhibits 33–36. The Debtor, alone, acquired assets and carried out other business on behalf of and in the name of Santex. Exhibits 16, 17, 23. Finally, it is the Debtor who possesses the records for Santex, including files spanning the entire period from 1980 through 1999. *See, e.g.,* Exhib-

---

4. Linda Hart testified that several documents purportedly signed by De Vries or Bauer were actually signed by the Debtor. Although Ms. Hart did not review and offer an opinion with respect to the De Vries and Bauer signatures on Exhibit 50, the Jaandsons' Share Certificate, the Court draws a reasonable inference that the Debtor also signed their names on that document.

its 20A–20D, 21–26, 33–36 & 81. Other than bankers and the registered corporate agents who performed various functions for Santex as part of their ordinary course of employment, the Court finds no evidence that anyone but the Debtor and his "Hans Bauer" alias was involved in—or even took any interest in—the operation and control of Santex.

Proof of the Debtor's absolute and unfettered control over Jaandsons is equally compelling. The Debtor (in his own name) initially requested the incorporation of Jaandsons on June 1, 1995. Exhibit 48. While the Debtor requested that the company be named Jaandsons Trust, Ltd., the company was actually incorporated days later as Jaandsons Corporation, Ltd. Exhibit 49. Consistent with the Debtor's June 1st request (*see* Exhibit 48), his two aliases were appointed as the first directors of Jaandsons and conducted the initial meeting of directors (Exhibit 49). Thereafter, the record discloses, all of the business activities of Jaandsons were carried out in the names of either "Hans Bauer," "Jan De Vries," or Juan Santaella (who was granted a power of attorney for Jaandsons in 1997). Tr. at 180, 183; Exhibits 51, 52, 53, 54, 56, 58, 59, 60, 63, 64, 65, 66, 72. The Court finds significant the extraordinary breadth of the power of attorney that the Debtor (through his aliases) granted to himself. That power not only authorized the Debtor to dispose of or acquire assets for Jaandsons "in his absolute discretion", and to "deal in any way" with the company's bank and financial institutions, but it also prospectively ratified and confirmed the Debtor's actions thereunder. Exhibit 59. As with Santex, it is the Debtor who possesses the records for Jaandsons (*see, e.g.,* Exhibits 48–54, 56, 58–60, 63–66, 72 & 81). Finally, the Court finds no evidence that anyone other than the Debtor was involved in—or took any interest in—the operation and control of Jaandsons.

The Debtor's use of his "Hans Bauer" and "Jan De Vries" aliases to operate Jaandsons further evidences the Debtor's ownership of that company. Using an alias to operate a company strongly implies that there is something to hide. For example, because an alias does not have a voice or a body—or at least no voice and body distinct from the individual using the alias—use of the alias poses obstacles when an actual person must be contacted, for instance, to confirm written instructions. For that reason, in a letter dated March 9, 2000, from "Hans Bauer" and "Jan De Vries," the Debtor's aliases provide authorization for the Debtor, himself to "verbally confirm any funds transfer instructions on behalf of [a Jaandsons' bank account at Northern Trust Bank]." Exhibit 54. How convenient! This evidence not only corroborates the independent and compelling evidence that "Hans Bauer" and "Jan De Vries" are simply names through which the Debtor himself controlled and managed Jaandsons, but it further confirms that there was no one else with any involvement in the company or its affairs. In short, the Debtor would not have chosen to distance his own name from Jaandsons by using aliases unless he had something to hide—namely, that he owned and controlled these entities.

**b.  The Debtor, Alone, Controlled And Enjoyed Benefits of Santex and Jaandsons**

The Court finds that the Debtor not only exercised exclusive management and control over the activities and bank accounts of Santex and Jaandsons, but that he (and to a far lesser extent his children insofar as he made payments to them or for their expenses) is the person who has enjoyed the financial benefits of these two companies. The unrebutted testimony of the

Trustee, a well-recognized and respected forensic accountant, establishes that the Debtor treated and used the Santex and Jaandsons bank accounts as his own personal checking accounts. The Debtor also commingled and otherwise treated the Santex and Jaandsons accounts as a single purse from which to fund himself. The Debtor paid his expenses from these accounts without making any apparent distinction between them. *See* Exhibits 27, 30, 55 & 57. Moreover, he routinely transferred substantial funds between them. Thus, while the Debtor transferred over $1.6 million from the Santex accounts to the Jaandsons accounts (Exhibits 27 & 30), the Debtor also transferred over $550,000 from the Jaandsons accounts to the Santex accounts (Exhibits 55 & 57).

Santex and Jaandsons have each owned two accounts in the United States. Santex's accounts were both at Eastern National Bank. Jaandsons had an account at Northern Trust Bank and, thereafter, an account at Southern Security Bank. The Court finds that the Debtor directly or indirectly received substantial sums from these four Santex and Jaandsons accounts during the eight and one-half year period from June 1993 through February 2002 (the period for which the Trustee had Santex and Jaandsons account records).

During this eight year period, the Debtor transferred more than $2.25 million in funds from Santex's two accounts to himself (including $980,000 that he transferred directly to his secret, numbered Swiss account). In addition, the Debtor wrote approximately 200 checks, in an amount aggregating nearly $500,000, from these two Santex accounts to pay for his mortgages, home renovations, utility bills, credit cards, insurance bills, yacht club and country club dues, as well as various expenses for his children. Exhibits 27 & 30. By comparison, the Debtor wrote only three checks,

aggregating just $7,700, that appear to be for the benefit of his mother. *Id.*

The Debtor continuously used the Jaandsons accounts at Northern Trust Bank and Southern Security Bank during the period from account opening in June 1995 through February 2002 in the very same way. In addition to receiving more than $270,000 in transfers to himself from these two Jaandsons accounts, the Debtor benefitted from hundreds and hundreds of checks—totaling more than $1.7 million—that paid his personal expenses for, among other things, monthly charges at the Key Biscayne Yacht Club and the Riviera Country Club; American Express and other charge card expenses; mortgage expenses; insurance expenses; landscaping expenses; utilities expenses; condominium association expenses; and boating expenses. Exhibits 55 & 57. The Debtor's mother, by comparison, appears to have received a single check, in the amount of $9,124, from these two Jaandsons accounts.

The Court further finds that the Debtor spent additional funds from the Santex and Jaandsons accounts (i) to fund various corporate entities that he owns directly and/or under the offshore umbrella of Santex and Jaandsons; and (ii) to purchase investments in the names of Santex and Jaandsons. Thus, the Debtor transferred over $687,000 to Valcorp Securities, a company the Debtor owns personally. Exhibits 27, 30, 55 & 57; *see* Exhibit 4; *see also* Exhibit 61 (showing an *additional* $106,250 transferred from Jaandsons's account at Guaranty Trust to Valcorp Securities). The Debtor transferred nearly another $500,000 to four companies—Field Real Estate Corp., Richmond Real Estate Corp., Rosal Real Estate Corp., and Cocuiza Real Estate Corp.—that he has owned either directly or under the cover of Santex since the mid–1990s. Exhibit 30; *see*

Exhibits 31–36 and 38—39. Finally, the Debtor invested another $3.0 million to acquire in the name of Santex and Jaandsons (or to fund) the following: a 36 percent interest in Electrocomm and its subsidiary, Haverfield (Exhibits 30, 40, 41); 119,120 shares of Latin American Gold, Inc. (Exhibits 16, 27); 275 shares of ASG Holdings Limited (Exhibits 55, 62, 69); a 100% interest in Intercapital Holdings L.P. and Intercapital Holdings, Inc. (Exhibit 61, 64–68); and an 18.93 percent interest in R2 Internet Ventures (Exhibit 61, 68). Significantly, the Debtor serves as an officer, director, partner or managing executive of Electrocomm, Haverfield, Intercapital Holdings and R2 Internet Ventures. Exhibit 5.

In short, the Court finds the Debtor's use of the Santex and Jaandsons accounts—particularly when combined with the virtual absence of any benefit from these accounts being received by the Debtor's mother or any other person—to be compelling evidence of his ownership of Santex and Jaandsons.

### 3. *Santex and Jaandsons Own Valuable Assets*

Santex and Jaandsons each own numerous valuable assets. The assets of Santex include: (i) a bank account at Eastern National Bank numbered 2061043812 (Exhibits 29 & 30); (ii) all of the outstanding shares of Field Real Estate Corp. (Exhibits 31, 32 & 33); (iii) all of the outstanding shares of Cocuiza Real Estate Corp. (Exhibits 31, 32 & 34); (iv) all of the outstanding shares of Richmond Real Estate Corp. (Exhibits 31, 32 & 35); (v) all of the outstanding shares of Rosal Real Estate Corp. (Exhibits 31, 32 & 36); (vi) 1,160,200 shares (representing approximately 36 percent of the issued and outstanding shares) of Electrocomm International, Ltd. (Exhibit 40); (vii) all of the outstanding shares of Agroinversiones, C.A. (Exhibit 43); (viii) all of the outstanding shares of Multinversiones, C.A. (Exhibits 114A, 44A & 44B); (ix) Bardela Enterprises (Exhibits 31, 32, 70 & 71); (x) Radovan Investments (Exhibits 31 & 32); and (xi) 119,120 shares of Latin American Gold, Inc. (Exhibits 31, 32 & 42). *See generally* Exhibit 121 at 46–55.

The assets of Jaandsons include: (i) a bank account at Southern Security Bank numbered 0310047501 (Exhibits 56 & 57); (ii) artwork described as Wilfredo Lam, L'Oisiu de Feu (2 sculptures), Baltazar Lobo Reposo 1988, Francisco Narvaez Bronce, and Jorge Gori Reclining Nude (Exhibit 63); (iii) a 100% interest in Intercapital Holdings, L.P. (Exhibits 64–67); (iv) an 18.93 percent interest in R2 Internet Ventures, LLC (Exhibit 68); and (v) 275 shares in ASG Holdings Limited (Exhibit 69). *See generally* Exhibit 121 at 56–65.

Santex and Jaandsons may possess additional valuable assets. Unfortunately, the Debtor's various misconduct has limited the Trustee's ability to obtain full and complete discovery on the scope of the holdings of these companies. Therefore, this Order will include relief directing the Debtor to provide a full accounting so that the Trustee will be able to determine and recover the full extent of the assets owned by Santex and Jaandsons. Subject only to bona fide claims of creditors of these entities, the Trustee, standing in the shoes of the Debtor, is entitled to bring all of the assets of Santex and Jaandsons into this bankruptcy estate.

### 4. *Strong Inferences Provide Compelling Corroboration of This Court's Findings*

In addition to the evidence of the Debtor's ownership of Santex, Jaandsons and their holdings, as summarized above, the Court is also persuaded by a series of inferences to be drawn against the Debt-

or—inferences from the Debtor's silence; inferences from the Debtor's pattern of willfully false testimony; inferences from the Debtor's discovery abuses and obstruction; and inferences from the Debtor's assertion of the Fifth Amendment. Together, these inferences further corroborate the findings of fact established from the Trustee's evidentiary presentation.

### a. The Inference From The Debtor's Silence

The evidence established that the Debtor is intimately involved in the affairs of both Santex and Jaandsons. As described earlier, the companies routinely funded personal, day-to-day expenses including monthly mortgage payments and credit card bills. *See* Exhibits 27, 30, 55, 57. Yet despite this close relationship, the Debtor called no one from either company to identify its owner, or to explain why the company was funding the Debtor's personal expenses, or even to explain how the company knew what bills to pay and where and when to pay them. Clearly, the Debtor is in a much better position than the Trustee to produce such a witness if one in fact exists. The Debtor's failure to call such a witness (or any witness at all) corroborates the Court's finding emanating from the Trustee's evidence: the Debtor is the only person with any association to these companies.

In discovery, the Debtor stated that his mother is the owner of Santex and Jaandsons. *See* Exhibit 123. According to those same discovery responses, she provided the Debtor with an unsworn statement that the Debtor incorporated in his answers. *Id.* If there were any truth to the claim that she is the owner of Santex and Jaandsons, why didn't the Debtor fly her in to testify ? Indeed, she would have every incentive to do so to protect her purported interest. The clear inference from her absence is that if called to testify,

she could not have provided honest testimony supporting the Debtor's claim that she is the owner.

The Debtor's complete failure to offer any testimonial or documentary evidence in his favor is a telling omission. The matters at issue in the Surrender Motion are serious and involve a demand that the Debtor turn over substantial assets. From these omissions, the Court draws a strong inference that the Trustee's allegations are true and his evidence is sound. *See Jones v. Otis Elevator Co.,* 861 F.2d 655, 658–59, (11th Cir.1988) (quoting *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893)) ("if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate [a] transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable"); *In re Prime Motor Inns, Inc.,* 167 B.R. 261, 263 n. 2 (Bankr. S.D.Fla.1994) (drawing adverse interest from party's failure to call two individuals as trial witnesses even though the individuals had been deposed by opposing counsel prior to trial).

### b. The Inference From The Debtor's Repeated And Willful Lies

The Court's finding that the Debtor owns Santex, Jaandsons and their holdings is further corroborated by the Debtor's prior false testimony in this case, including the following examples:

First, in a Rule 2004 examination taken on November 21, 2000, the Debtor testified that he did not know of any bank accounts held by Santex except for an account at Eastern National Bank. Exhibit 107. He testified during the same examination that he did not have signing authority with respect to any Santex account outside the United States. Exhibit 108. In fact, at the time this testimony was given, Santex

had an account outside the United States at Guaranty Trust Bank, Ltd. in the Bahamas. *See* Composite Exhibit 60 (several documents signed by the Debtor, referencing Santex's account at Guaranty Trust Bank, Ltd. throughout the year 2000). Clearly, the Debtor knew about the account at Guaranty Trust Bank, since he exercised signatory authority on a number of occasions. *See, e.g.,* Exhibits 25 & 26. The Debtor's failure to disclose this Santex account further supports the conclusion that he deliberately concealed his ownership and control of the company.

Second, the Debtor gave false testimony about his relationship to Jaandsons. In a Rule 2004 examination taken on November 13, 2000, the Debtor swore that he had never had signatory authority on any Jaandsons account. Exhibit 109. He gave the exact same testimony in another Rule 2004 examination nine days later. Exhibit 110. In fact, at the time this testimony was given, the Debtor had been granted a power of attorney with respect to Jaandsons that had specifically authorized him to sign for the company, and to open, close and operate bank accounts in its name anywhere in the world. Exhibit 59. The Debtor exercised his signatory authority with respect to a Jaandsons account at Guaranty Trust Bank, Ltd. in the Bahamas within a few months prior to, as well as a few months after his 2004 testimony in which he disclaimed any such authority. Exhibit 60. So, once again, the Debtor lied under oath, lies undoubtedly designed to hide the fact that he was the true owner of Jaandsons.

Third, the Debtor also testified falsely about his knowledge of the assets owned by Santex. In a Rule 2004 examination taken on November 22, 2000, the Debtor swore that he did not know who owned Field Real Estate Company. Exhibit 115A. Less than one month later, on De-

cember 12, 2000, he testified that he did not know who owned Cocuiza Real Estate Company. Exhibit 115B. In fact, and contrary to his testimony, just weeks before the Debtor gave this testimony, on October 27, 2000, he signed powers of attorney, on behalf of Santex, that identify both Field and Cocuiza as 100 percent subsidiaries of Santex. Exhibits 33 & 34. Again, it is a fair inference that the Debtor's false testimony was intended to conceal the size and nature of Santex's holdings and to conceal his knowledge of these holdings.

Fourth, and quite obviously from the findings made earlier, the Debtor lied about "Hans Bauer" and "Jan De Vries" and was not even consistent in his lies. For example, in his November 21, 2000, examination, the Debtor testified that he had seen Mr. De Vries "two or three times a year" in the past few years, and that he had seen Mr. Bauer the previous year (1999). Exhibit 111. The Debtor then testified during an August 2001 discovery hearing before Judge Utschig that he had last seen Mr. Bauer "October last year" (2000). Exhibit 112. In interrogatory answers issued in November 2001, however, the Debtor stated that he did not recall having seen either Mr. De Vries or Mr. Bauer "since 1994." Exhibit 123. These statements about Bauer and De Vries were willfully false and part of a clear pattern of deception intended to conceal the Debtor's ownership and control of Santex and Jaandsons.

Fifth, the Debtor lied about his secret Swiss Account. At his § 341 Meeting of Creditors on September 19, 2000, the Debtor swore that his bankruptcy schedules—which did not list any interest in the Swiss Account—included all assets in which he had an interest "anywhere in the world." Exhibit 102. In a later Rule 2004 examination on November 21, 2000, the

Debtor testified that from 1994 to the present, he had no bank accounts outside the United States in any country other than Venezuela. Exhibit 103. *See also* Exhibit 104 (testimony from deposition taken on January 24, 2000, in which Mr. Santaella testified that other than a Venezuelan account, he has no other bank accounts anywhere in the world). At the time this testimony was given, however, the Debtor personally had an interest in the Swiss Account. Exhibits 8 & 9. The Debtor engaged in substantial activity in this account, involving significant sums of money.[5] With this much account activity, the Debtor's failure to identify the Swiss Account in response to repeated, specific questions was obviously not an innocent mistake, but rather, more lies to conceal his assets. In view of the interrelationship between the Swiss Account and Santex (*see* Exhibits 27 and 30), and in light of all the circumstances, the Court finds that this false testimony (like the other false testimony outlined above) was part of a consistent pattern of deception by the Debtor to conceal his assets including the concealment of control and ownership of Santex and Jaandsons.

█ In sum, the Debtor's repeated and egregious pattern of perjury creates a strong negative inference on the contested issues of ownership. *See United States v. Philatelic Leasing, Ltd.,* 601 F.Supp. 1554, 1565 (S.D.N.Y.1985), *aff'd* 794 F.2d 781 (2d Cir.1986) ("when a litigating party resorts to 'falsehood or other fraud' in trying to establish a position, the court may conclude the position to be without merit and that the relevant facts are contrary to those asserted by the party"); *see also 2 WIGMORE ON EVIDENCE* § 278

(Chadbourn rev.1979) ("It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit").

### c. *The Inference From The Debtor's Willful Obstruction*

The Court finds that throughout this case, the Debtor has willfully obstructed the Trustee's investigation of the true scope of the bankruptcy estate. The Court relies here on three egregious instances.

*First,* on May 24, 2001, the Trustee issued a Rule 2004 subpoena to Insinger de Beaufort. Exhibit 78. That subpoena, a copy of which was served on the Debtor, directs Insinger—including all offices and affiliates located in the British Virgin Islands—to produce all documents relating to Jaandsons Corporation. *Id.* Six days later, the Debtor, in the names of his two aliases, signed a letter to Insinger's British Virgin Islands affiliate directing it not to comply with the subpoena because, as the registered agent for Jaandsons, Insinger had a fiduciary duty not to cause unnecessary harm. Exhibit 79. The Court infers from this letter that the Debtor was concerned that Insinger possessed material evidence that would, if disclosed, further corroborate the Debtor's ownership of Jaandsons.

---

5. *See, e.g.,* Exhibit 27 (check signed by Juan Santaella for $25,000 from Santex account at Eastern National Bank deposited in the Swiss Account). *See also* Exhibit 30 (wire transfers totaling $955,000 from Santex account at Eastern National Bank to the Swiss Account); Exhibit 71 ($400,000 wire transfer from Bardela Enterprises to the Swiss Account).

Second, from the inception of this bankruptcy case, the creditors and the Trustee have issued Rule 2004 document requests calling for the production of all documents relating to the Debtor's bankruptcy estate. *See* Exhibits 6 & 80. On February 11, 2002, this Court authorized the Trustee to conduct an inspection of the Debtor's business offices in order to locate documents relevant to determining the scope of that estate. As a result of the inspection, the Trustee obtained many of the documents that were presented during the May 8, 2002, evidentiary hearing. Among the documents located was a six page inventory of boxed files relating to numerous assets and companies that are the subject of the Trustee's investigation, including four files relating to Darier Hentsch et Cie (where the Swiss Account is located) for the period from 1996 through 2001. Exhibit 81. The Debtor's concealment of these documents—and, indeed, the Debtor's apparent continuing concealment of the files listed on the six page inventory—demonstrates the Debtor's recognition that those documents, if produced, would provide further evidence of the Debtor's ownership of Santex, Jaandsons, and all of their holdings.

Third, as described at the outset of these findings, in November 2001, the Debtor submitted the falsified Hans Bauer and Jan De Vries declarations to the Trustee in an attempt to dissuade the Trustee from further investigating the existence of "Hans Bauer" and "Jan De Vries," and the relationship of Santex and Jaandsons to the bankruptcy estate. The Court finds that this misconduct clearly evidences the Debtor's knowledge that if the Trustee continued to investigate he would eventually find—as has, in fact, happened—that the Debtor is the owner of Santex and Jaandsons, and operates those two companies through his dual aliases.

The only rational inference from the Debtor's obstruction of discovery is that he was attempting to conceal his ownership of Santex, Jaandsons and all of their holdings from the Trustee and his creditors. *See Evans v. Robbins*, 897 F.2d 966, 970 (8th Cir.1990) (drawing inference against debtor in turnover action when the debtor failed to produce documents under his control allegedly supporting debtor's claims); *Chemical Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91, 94 (S.D.N.Y.1994) ("An adverse inference against a party may be drawn when its litigation conduct is such that a fact finder could infer that attempts to interfere with pursuit of the merits were made because of the party's awareness of [the] weakness of its position.").

### d. The Inference From The Debtor's Invocation of the Fifth Amendment

Finally, the Court finds that the Debtor's decision to invoke the Fifth Amendment right not to incriminate himself provides still further support for the conclusions independently reached by the Court. Tr. at 31–39, Exhibit 121. The Debtor has unique knowledge of the disputed issues, and a strong incentive to come forward with innocent explanations for the Trustee's serious allegations. For these reasons, the inference to be drawn from the invocation of the Fifth Amendment in this case is a particularly strong one. *See In re Sterling–Harris Ford, Inc.*, 315 F.2d 277, 279 (7th Cir.1963) (holding that turnover defendants are free to assert privilege against self-incrimination, but not "entitled to use it as a sword" to escape the obligation of answering well-founded allegations); *In re Crabtree*, 39 B.R. 718, 724 (Bankr.E.D.Tenn.1984) ("Adverse inferences may be drawn in a civil action against a party who refuses to testify in

response to probative evidence on the basis of constitutional privilege"); *see generally Baxter v. Palmigiano,* 425 U.S. 308, 317, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) 1315 (applying adverse inference from assertion of Fifth Amendment in non-criminal context); *In re Metzgar,* 127 B.R. 708, 712 (Bankr.M.D.Fla.1991); *In re Salzman,* 61 B.R. 878, 890 (Bankr.S.D.N.Y.1986) ("when a debtor refuses to testify in response to probative evidence offered against him ... it is proper for the Bankruptcy Court to draw adverse inferences from his invocation against self-incrimination.").

█ Courts have discretion in determining whether to draw adverse inferences from a litigant's assertion of the Fifth Amendment privilege. An adverse inference may be given significant weight, because silence when one would be expected to speak is a powerful persuader. *See United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 68 L.Ed. 221 (1923) cited in *Libutti v. U.S.,* 178 F.3d 114, 120 (2nd Cir.1999). Where, as here, the Court has independently concluded that the Debtor has presented false schedules, has hidden assets and has created fictitious aliases to conceal his fraudulent conduct, the Court has no hesitation in drawing permissible adverse inferences from the Debtor's choice to invoke his privilege against self-incrimination.

### C. *The Trustee Also Proved that the Debtor Owns Valuable Artwork and the Caracas Residence*

The Court finds that the Trustee has established by clear and convincing evidence that the Debtor holds assets of the bankruptcy estate, in addition to Santex and Jaandsons, that he has not disclosed.

First, the Debtor has admitted that the Debtor is the owner, together with his wife, of the real estate identified as Apartment 11–A at Residencias Jardin. *See* Juan Santaella's Response To Trustee's Motion To Compel Surrender of Estate Property ("The Debtor and his wife own the residence in Caracas [that is at issue in the Trustee's Motion to Compel Surrender].") (Emphasis omitted.) *See also* Exhibits 74 & 75. The Court further finds that the Debtor failed to disclose his ownership of this real estate on his bankruptcy schedules, lied about its existence during his Rule 2004 examination, failed to assert any exemption with respect to it, and has made no attempt to amend his schedules in order to address this real estate. *See* Exhibits 4 & 116.

█ In his written Opposition, the Debtor argued that he should be entitled to assert a tenancy by the entireties exemption as to the Residencias Jardin property pursuant to Venezuelan law and 11 U.S.C. § 522(b)(2)(B). The law is clear, however, that "concealment of an asset will bar exemption of that asset." *Matter of Doan,* 672 F.2d 831, 833 (11th Cir.1982); *see also In re Talmo,* 185 B.R. 637, 644, 649 (Bankr.S.D.Fla.1995). As the Seventh Circuit has explained: "If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *In re Yonikus,* 996 F.2d 866, 872 (7th Cir.1993) (*quoting Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985)); *see also, e.g., In re Markmueller,* 165 B.R. 897 (Bankr.E.D.Mo.1994), *aff'd* 51 F.3d 775 (8th Cir.1995) (holding that failure to disclose asset on schedules is type of concealment requiring denial of exemption when trustee thereafter discovers the property through his own investigation). Because the Debtor failed to disclose Residencias Jardin on his schedules, and affirmatively concealed it from the Trustee during the course of discovery in this case, the Court concludes that the Debtor is barred from

asserting any exemption now that his concealment has been discovered. The Court further holds, as a separate and independent ground, that the Debtor has failed to present any evidence or argument from which this Court could conclude that Venezuela recognizes a tenancy by the entireties doctrine.

■■■ Second, the Court finds that the Debtor is the owner of artwork with a value of approximately $250,000. The Court bases this finding on the Debtor's written admission that he owned this artwork on June 6, 1999. Exhibit 76. The Debtor presented no evidence that he divested himself of this artwork between the date of the admission and the bankruptcy filing. The Court further finds that the Debtor failed to disclose this artwork on his bankruptcy schedules, failed to assert any exemption with respect to it, and has made no attempt to amend his schedules to describe this property. *See* Exhibit 4.

### Conclusion

When, as here (1) an individual exercises direct control over funds flowing in and out of corporations; (2) covers up his control by fraudulently executing documents in the names of non-existent persons he creates; and (3) provides no evidence to refute prior admissions of ownership or to support his disclaimer of ownership, there is only one logical and indeed, inescapable, conclusion: The Debtor owns Santex and Jaandson's and must account for their financial affairs and turn over their assets.

Similar pervasive, uncontradicted evidence compels the conclusion that the Debtor, alone, has been the owner of Residencias Jardin and the artwork at all times from the Debtor's bankruptcy petition through the present. On each independent ground, the Court reaches the same conclusion of law: Santex, Jaandsons, Residencias Jardin and the artwork are prop-

erty of the Debtor's bankruptcy estate and must be immediately turned over to the Trustee.

For the foregoing reasons, it is—

ORDERED AND ADJUDGED as follows:

1. The Surrender Motion is granted.

2. The Debtor shall, within five days, surrender to the Trustee all legal and equitable ownership rights and interests in Santex, N.V., Jaandsons Corporation, Ltd., and the holdings of each, including all original legal titles, share certificates, and all other evidences of ownership;

3. The Debtor shall, within twenty days, provide the Trustee an accounting of all financial and operational activities of Santex, Jaandsons and every subsidiary of each for the period from January 1, 1994, to the present, as well as a current balance sheet for each entity, identifying all assets and liabilities;

4. The Debtor shall, within five days, surrender and transfer to the Trustee all legal and equitable title to the Residencias Jardin Los Granados property in Caracas, Venezuela;

5. The Debtor shall cooperate fully and take all actions requested by the Trustee to facilitate the surrender of all of the aforementioned assets;

6. The Debtor shall immediately account to the Trustee for all other property that he currently owns, legally or equitably;

7. The Debtor shall, within five days, produce to the Trustee all documents relating to Santex, N.V., Jaandsons Corporation, Ltd., and their holdings; and

8. The Debtor shall take all possible actions requested by the Trustee in order to support actively the Trustee's efforts to obtain information from third parties with-

in the United States and abroad about any and all potential assets of the bankruptcy estate.